# United States Court of Appeals
## For the First Circuit

No. 08-1183

UNITED STATES OF AMERICA,

Appellee,

v.

NEIL STIERHOFF,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

Dana A. Curhan for appellant.
Mark S. Determan, Attorney, Tax Division, with whom Nathan J. Hochman, Assistant Attorney General, Robert Clark Corrente, United States Attorney, Alan Hechtkope and Karen M. Quesnel, Attorneys, were on brief, for appellee.

December 1, 2008

**SELYA**, <u>Circuit Judge</u>.  This case began when a young woman complained about a strange man who was harassing her.  The state police launched an investigation, which later took an unexpected turn and morphed into an indictment for federal income tax evasion.  The tale of how the stalker became the stalked follows.

## I.  BACKGROUND

We rehearse here only those facts that are useful to place the instant appeal in perspective.  In setting forth this account, we take those facts in the light most hospitable to the jury's verdict.  <u>See</u> <u>United States</u> v. <u>Diaz</u>, 300 F.3d 66, 69 (1st Cir. 2002). Other factual information is added in our subsequent discussion of particular issues.

In March of 2002, a young woman contacted the Rhode Island State Police and complained about a stalker.  She told the troopers that the man had approached her at work, given her unwanted cards and poems, and left poetic messages on her windshield while her car was parked in a dormitory parking lot at Rhode Island College.  The troopers traced the suspected stalker through his license plate number and identified him as Neil Stierhoff (the defendant herein).

Between April 4 and April 12, 2002, the troopers conducted a surveillance that tended to confirm their suspicions about the defendant's obsession with the complainant.  They then devised a sting operation that played out on the night of April 12.

The sting worked, and the troopers arrested the defendant on the spot.

Following the arrest, the troopers read the defendant his <u>Miranda</u> rights, <u>see</u> <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436, 444-45 (1966), and queried him about his activities vis-à-vis the complainant. This interrogation left the troopers with a desire to learn more about both the defendant's true identity and the poems he had written. In an effort to fill those investigative gaps, the troopers asked the defendant to authorize a search of his residence (a rented room on the second floor of a house at 25 Hollywood Road in Providence). The defendant acquiesced, perusing and signing a proffered consent-to-search form. The troopers then transported him to the Hollywood Road address.

The defendant was present during the ensuing search. The troopers found a treasure trove of interesting items. These items included the computer on which the defendant had composed the poems, greeting cards similar to those delivered to the complainant, a briefcase containing $100,000 in cash, another $40,000 in cash lodged in a desk drawer, and a myriad of financial documents. The troopers proceeded to make inquiries about the cash and a bank statement.

We need not linger over the details of the interrogation. It suffices to say that the troopers concluded that the defendant had been operating a highly lucrative business featuring the sale

of used electronic equipment over the internet. When they noticed that the aforementioned bank statement bore the name "Joseph Adams," the defendant explained that he used that pseudonym in conducting this business. As to the large sums of cash on hand, he ventured that he neither trusted banks nor paid any taxes (federal or state).

Later that evening, the troopers conducted a search of a storage unit leased by the defendant (who signed another consent-to-search form in connection therewith). At the storage unit, the troopers discovered high-end computer equipment and a salmagundi of business records. The documents bore a wide range of individual and entity names, most of which comprised variations on the "Joseph Adams" pseudonym.

In due course, the troopers contacted the Internal Revenue Service (IRS) and relayed pertinent portions of the information they had unearthed to that federal agency. The IRS initiated its own investigation. That probe confirmed the defendant's aversion to the payment of federal income taxes.

From there, the defendant found himself under attack on two fronts. The state successfully prosecuted him on charges related to his stalking activities. See State v. Stierhoff (Stierhoff I), 879 A.2d 425 (R.I. 2005). That conviction is final and need not concern us.

-4-

The other shoe dropped on March 22, 2006, when a federal grand jury in the District of Rhode Island handed up an indictment charging the defendant with four counts of income tax evasion covering calendar years 1999, 2000, 2001, and 2002, respectively, in violation of 26 U.S.C. § 7201. The government asserted that the defendant had total unreported taxable income of approximately $1,250,000 during this four-year span and that he owed nearly $460,000 in back taxes.

After some pretrial skirmishing, see, e.g., United States v. Stierhoff (Stierhoff II), 477 F. Supp. 2d 423 (D.R.I. 2007), a trial jury found the defendant guilty on all counts. In the aftermath of the verdict, the defendant renewed his earlier motions for dismissal of the indictment, judgment of acquittal, and the declaration of a mistrial. He simultaneously moved for a new trial. See Fed. R. Crim. P. 33. The district court denied all the motions in an erudite rescript. See United States v. Stierhoff (Stierhoff III), 500 F. Supp. 2d 55, 72 (D.R.I. 2007). For the most part, the details of those motions are unimportant; the majority of the legal theories on which they rested have not been resuscitated on appeal.

On February 1, 2008, the district court sentenced the defendant to concurrent 46-month incarcerative terms on the four counts of conviction. This timely appeal followed.

## II. ANALYSIS

Before us, the defendant advances five assignments of error. These implicate the district court's purported failures (i) to suppress evidence; (ii) to recognize the government's duty to prove that he was a person subject to the tax code; (iii) to grant judgment of acquittal premised upon evidentiary insufficiency; (iv) to cabin the use of a summary witness; and (v) to limit its sentencing calculus to facts found by the jury. We address these claims sequentially.

### A. <u>Suppression</u>.

The defendant calumnizes the district court's refusal to suppress evidence of the cash found in his briefcase during the search of his room. He argues that a closed briefcase was not within the scope of the consent given. This argument is flawed in several respects.

The threshold question is one of waiver. The defendant asserted below, in relevant part, that his consent was limited to a search of a particular computer file folder. The district court accepted this argument with respect to the search of his computer hard drive, <u>Stierhoff II</u>, 477 F. Supp. 2d at 442, but disagreed that the consent was limited vis-à-vis the search of the room, <u>id</u>. at 436. The defendant's claim on appeal is more nuanced; he does not protest the district court's determination that the room search was within the scope of the consent but, rather, contends that even

if the scope of the consent extended into the room, it did not extend to a closed briefcase within the room.

Noting this shift in emphasis, the government maintains that there has been a waiver. See Fed. R. Crim. P. 12(b)(3). It is arguable that the government's position is correct. See, e.g., United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998) (stating that waiver "applies not only when a defendant has failed altogether to make a suppression motion but also when, having made one, he has neglected to include the particular ground that he later seeks to argue"). We choose, however, not to resolve the waiver question. Because the defendant's contention is easily dispatched on the merits, we address it frontally.

It is apodictic that a warrantless search may be conducted with the voluntary consent of a person authorized to give it. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). The scope of a consensual search is generally defined by its expressed object, and such a search may not exceed the scope of the consent given. United States v. Marshall, 348 F.3d 281, 286-87 (1st Cir. 2003). Typically, courts look beyond the formal wording of the consent itself to the totality of the circumstances that inform the meaning of those words in a given situation. Id. This includes, but is by no means limited to, "contemporaneous police statements and actions." United States v. Meléndez, 301 F.3d 27, 32 (1st Cir. 2002).

-7-

Notwithstanding the fact-specific nature of an inquiry into the scope of consent, some general principles remain in play. One such principle is relevant here: "a general consent to search . . . subsumes the specific consent to search any easily accessible containers" that may be located within the designated search area. United States v. Zapata, 18 F.3d 971, 977 (1st Cir. 1994) (citing Florida v. Jimeno, 500 U.S. 248, 251-52 (1991)).

The circumstances here do not suggest any special limitations on the scope of either the consent or the search. The troopers employed a generic consent form, which itself did not restrict the contemplated search in any way. Furthermore, the form referred generally to "letters, papers, or other property." This boilerplate language, unmodified, indicates an intention to go well beyond a mere computer search.

In an effort to overcome this impression, the defendant notes that the troopers told him that they wanted to look for "poems." He maintains that he signed the form while telling the troopers that the evidence they sought could be found on his computer. On this basis, he argues that the object of the search should be deemed to be his computer (and, thus, that the scope of his consent was limited accordingly). This argument lacks force.

The appropriate standard for gauging the scope of a search is one of objective reasonableness. Marshall, 348 F.3d at 287. In applying that standard, the dialogue between the officers

and the consenting party is relevant, but the consenting party's subjective belief is not controlling.  <u>Id.</u>

In this instance, the objective facts militate against the defendant's crabbed view of the scope of his consent.  The stated object of the search was not the computer but, rather, poems and other evidence of the defendant's alleged stalking activities (and, to a lesser extent, of his true identity).  <u>See</u> <u>Stierhoff II</u>, 477 F. Supp. 2d at 435.  The troopers testified that, although the defendant related that a specific file folder on his computer encompassed the poems, he never told them that his computer was the <u>sole</u> repository of the evidence they were seeking. The district court credited the troopers' testimony. <u>Id.</u> at 426.  Because that credibility judgment is not clearly erroneous, we must honor it. <u>Zapata</u>, 18 F.3d at 975.

At any rate, the fact that the computer was one place in the search area in which objects of the search might be found did not automatically limit the scope of the consent to that one locus. A police officer is not required to take a suspect's statements concerning the whereabouts of incriminating evidence at face value. <u>See</u>, <u>e.g.</u>, <u>State</u> v. <u>Koucoules</u>, 343 A.2d 860, 870-71 (Me. 1974) (refusing to limit search to locations within search area specified by the defendant as the likely repositories of the object of the search).  Here, moreover, there were other objects of the search —

documents relating to identity — which the trooper reasonably could have anticipated would be kept in a briefcase.

We add that the defendant's present statement of his subjective belief that the search would be strictly limited to his computer lacks even a patina of plausibility.  He observed the search in progress and voiced no objection to either the ransacking of his room or the opening of his unlocked briefcase.  This passivity belies his current contention.  See, e.g., United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996).

Given these circumstances, the question reduces to whether, considering the object of the search — poems — it was objectively reasonable for the troopers to conclude that a briefcase is a place in which such items might be kept.  See Jimeno, 500 U.S. at 249.  This question virtually answers itself. Briefcases are commonly used to hold important personal papers. Romantic poems and letters to a love interest clearly qualify.  We hold, therefore, that the district court did not err in refusing to suppress the evidentiary fruits of the briefcase search.

**B.  Person Subject to the Tax Code.**

The defendant's next plaint relates to the district court's supposed failure to recognize the absence of any proof that he was a person subject to the tax code.  Because this plaint makes

its debut on appeal,[1] our review is for plain error.  See United States v. Leahy, 473 F.3d 401, 410 (1st Cir. 2007).

The defendant's argument has two facets.  First, he reasons that being a person subject to the tax code is an element of the offense of tax evasion, which the evidence failed to establish.  This reasoning rests on a faulty premise.  The elements of the offense of tax evasion are the existence of a tax deficiency, an affirmative act of evasion or attempted evasion, and a showing of willfulness.  See Sansone v. United States, 380 U.S. 343, 351 (1965).  Consequently, being "a person subject to the tax code" is not per se an element of this offense.

Of course, the government had to prove that the defendant was subject to the Internal Revenue Code in order to prove a tax deficiency.  The evidence, however, taken in the light most favorable to the verdict (as it must be), established that the defendant was a citizen and resident of Rhode Island; that he conducted business there; that his business earned sufficient income to require him to file a federal income tax return for each of the years in question; and that no such returns were filed.

---

[1] The docket reflects that the defendant attempted to raise this point by filing a belated motion in the district court.  Since that motion was filed after the case was pending on appeal, the district court had no jurisdiction to consider it.  See Griggs v. Provident Consumer Disc. Co., 459 U.S. 56, 58 (1982).  Consequently, we treat that motion as a nullity.

-11-

That was enough to render the defendant a person subject to the tax code.  See 26 U.S.C. § 6012.

The second facet of the defendant's argument suffers from the same infirmities.  He assails the district court for neglecting to charge the jury that being a person subject to the tax code is an element of the offense of tax evasion but, as noted above, such instruction would have been incorrect.

Here, moreover, the defendant did not request a jury instruction on this point, nor did he argue this theory of defense to the jury.  The district court instructed the jury that, in order to convict, it must find "that the defendant had a substantial tax due and owing."  That charge necessarily required the jury to determine, as a condition precedent to a guilty verdict, that the defendant was a person subject to the tax code.  No more was exigible.  See United States v. George, 448 F.3d 96, 100 (1st Cir. 2006) ("Where a defendant does not offer a particular instruction, and does not rely on the theory of the defense embodied in that instruction at trial, the district court's failure to offer an instruction sua sponte is not plain error." (quoting United States v. Montgomery, 150 F.3d 983, 996 (9th Cir. 1998))).

### C.  **Willfulness**.

The defendant next challenges the district court's denial of his motion for judgment of acquittal, asserting a purported lack of proof of willfulness.  Fed. R. Crim. P. 29.  This claim of error

is properly preserved. See Stierhoff III, 500 F. Supp. 2d at 64-65. Hence, we review the denial of the defendant's motion de novo to determine "whether the evidence, construed favorably to the government, permitted rational jurors to conclude, beyond a reasonable doubt, that the defendant was guilty as charged." United States v. Sebaggala, 256 F.3d 59, 63 (1st Cir. 2001). The assessment takes into account both direct and circumstantial evidence. United States v. Santiago, 83 F.3d 20, 23 (1st Cir. 1996). Circumstantial evidence of willfulness, standing alone, can suffice to sustain the government's burden of proof. United States v. Boulerice, 325 F.3d 75, 80 (1st Cir. 2003).

In tax cases, "the standard for the statutory willfulness requirement is the voluntary, intentional violation of a known legal duty." Cheek v. United States, 498 U.S. 192, 201 (1991) (citations and internal quotation marks omitted); see United States v. Johnson, 893 F.2d 451, 453 (1st Cir. 1990). Here, the defendant contends that the government failed to establish that he knew of his obligation to pay income taxes, so he could not have acted willfully. As framed, this contention rests largely on the government's failure to introduce specific evidence of any previously filed federal income tax returns.

To be sure, one way to show that a defendant knew of his obligation to pay taxes may be to offer evidence that he filed a tax return for a previous year. See, e.g., United States v.

<u>Sempos</u>, 772 F.2d 1, 2 (1st Cir. 1985).  But even though such a proffer may be sufficient to ground a finding of willfulness, it is by no means a necessary part of the needed mosaic of proof.  The defendant's contrary contention ignores the Supreme Court's admonition that "Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation."  <u>Spies</u> v. <u>United States</u>, 317 U.S. 492, 499 (1943).  Willfulness may be inferred from "any conduct, the likely effect of which would be to mislead or to conceal."  <u>Id.</u>

In the case at bar, the evidence against the defendant was entirely consistent with an inference of willfulness.  The case law suggests that such an inference can rest, in part, on a defendant's employment of aliases and nominee entities when conducting business.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Daniel</u>, 956 F.2d 540, 543 (6th Cir. 1992).  Similarly, the case law teaches that an inference of willfulness can rest, in part, on a defendant's persistent failure to file income tax returns over several years.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Greenlee</u>, 517 F.2d 899, 903 (3d Cir. 1975).  The case law further suggests that an inference of willfulness can rest, in part, on the pervasive use of non-interest-bearing accounts (which do not trigger mechanical reporting of income earned).  <u>Cf.</u> <u>United States</u> v. <u>Smith</u>, 424 F.3d 992, 1009 (9th Cir. 2005) (noting use of non-interest bearing

-14-

accounts in a tax evasion scheme as evidence of aid, assistance, and advice in a prosecution under 26 U.S.C. § 7602(2)).  Then, too, the case law indicates that regularly conducting business in cash where checks normally would be used can be deemed a badge of willfulness.  See, e.g., United States v. Conley, 826 F.2d 551, 557 (7th Cir. 1987).  Proof that the defendant routinely used untraceable money orders instead of personal or corporate checks is equally suggestive.  See, e.g., United States v. Tipton, 56 F.3d 1009, 1013-14 (9th Cir. 1995).  Finally, earning substantial income during several tax years but not reporting any of that income can be a significant indicium of willfulness.  See, e.g., United States v. Bohrer, 807 F.2d 159, 162 (10th Cir. 1986).

Here, the government introduced evidence in each of these categories.  It supplemented that evidence with proof that the defendant was an educated, experienced, and sophisticated businessman — a showing that strengthened the inference of willfulness.  See, e.g., United States v. MacKenzie, 777 F.2d 811, 818 (2d Cir. 1985).  To cinch matters, two troopers testified that the defendant was aware that he had not paid any federal income taxes (he told them as much).

Of course, context is important, and there might be innocent explanations for the defendant's actions and statements. But the context here is damning, and the sheer number of telltale indicators works to fortify the inference that the government would

-15-

have us draw.  See Gaunt v. United States, 184 F.2d 284, 290 (1st Cir. 1950).  What counts is that, on the evidence assembled here, a rational jury easily could have inferred — as this jury did — that the defendant knew of his obligation to file federal income tax returns and that his failure to do so constituted an intentional violation of a known legal duty.  See Cheek, 498 U.S. at 201.  Consequently, the district court did not err in denying the motion for judgment of acquittal.

### D. **Summary Witness**.

At trial, the government presented the testimony of Michael Pleshaw, an experienced IRS agent, as a summary witness. The defendant argues that the district court erred in allowing this testimony because it embodied impermissible legal conclusions.  We review a trial court's decision to admit or exclude evidence for abuse of discretion.  United States v. Maldonado-Garcia, 446 F.3d 227, 231 (1st Cir. 2006).

In denying the defendant's post-verdict motions, the district court described Pleshaw's testimony in meticulous detail. See Stierhoff III, 500 F. Supp. 2d at 66-68.  We assume the reader's familiarity with that narrative and, thus, limit ourselves to an overview of the testimony.

Pleshaw sat through the trial and studied the amplitudinous documentary evidence.  Based on the information thus

acquired, he calculated the defendant's tax liability for the years at issue.

Pleshaw's methodology was unremarkable. Using bank deposit records, Pleshaw computed the defendant's gross receipts, again on a year-by-year basis. He then set to one side non-taxable receipts (such as loan proceeds) and subtracted business expenses (treating all non-cash withdrawals from the defendant's accounts as deductible), year by year. To the 2002 total, he added the cash found during the search (which the defendant had admitted to a trooper emanated from his business dealings).

In that manner, Pleshaw arrived at an estimate of the defendant's net profits for each year. Thereafter, he adjusted for self-employment taxes, took the standard deduction, and factored in personal exemptions. These computations yielded the defendant's putative taxable income for each of the four years in question. From there, elementary school arithmetic — an application of the rate table — produced annual figures for taxes due and owing.

Pleshaw's testimony fits comfortably within the mine-run of permissible summary witness testimony in tax cases. We have recognized as a general proposition that testimony by an IRS agent that allows the witness to apply the basic assumptions and principles of tax accounting to particular facts is appropriate in a tax evasion case. See, e.g., United States v. Hatch, 514 F.3d 145, 165 (1st Cir. 2008); see also United States v. Mikutowicz, 365

-17-

F.3d 65, 72 (1st Cir. 2004) (collecting cases). The key to admissibility is that the summary witness's testimony does no more than analyze facts already introduced into evidence and spell out the tax consequences that necessarily flow from those facts. See United States v. Pree, 408 F.3d 855, 869 (7th Cir. 2005). We hold, therefore, that in a tax evasion case, a summary witness may be permitted to summarize and analyze the facts of record as long as the witness does not directly address the ultimate question of whether the accused did in fact intend to evade federal income taxes. See Mikutowicz, 365 F.3d at 72; United States v. Sabino, 274 F.3d 1053, 1067 (6th Cir. 2001).

The defendant struggles to parry this thrust. He points out that a summary witness may not give legal opinions that purport to determine a defendant's guilt, nor may such a witness instruct the jury on controlling legal principles. See Mikutowicz, 365 F.3d at 72. Those generalizations are true as far as they go, but neither generalization was offended here. A careful review of the record shows that Pleshaw's testimony did not trespass into this forbidden terrain. He summarized the evidence and stated his conclusions regarding what that evidence showed as to the defendant's tax liability for the years in question. The characterizations that he made en route to those conclusions (classifying various entries as, say, "income" or "expenses") did not represent impermissible legal opinions but, rather, under the

-18-

methodology that Pleshaw used, were part of a mechanical sorting of entries (e.g., classifying all receipts as "income" and all withdrawals as "expenses").[2]

The defendant mentions in passing that the district court did not allow Pleshaw to testify as an expert. That is true, but it ignores both that the government gave appropriate advance notice of its intention to offer Pleshaw's testimony and that Pleshaw had the credentials needed to offer expert opinion testimony. Despite these facts, the district court decided that, considering the limited use that the government proposed to make of him, there was no need for him to testify as an expert. See Stierhoff III, 500 F. Supp. 2d at 68.

We see no error. Our cases suggest that expert witness status is not always a condition precedent to allowing an IRS agent to testify as a summary witness in a tax evasion prosecution. See, e.g., Hatch, 514 F.3d at 164; United States v. Milkiewicz, 470 F.3d 390, 401 (1st Cir. 2006). While such testimony sometimes may require expert qualification — the relative simplicity or complexity accompanying tax calculations can vary greatly — the

---

[2] We caution that situations exist in which the characterization of a specific item may call for a legal opinion. See, e.g., Comm'r v. Duberstein, 363 U.S. 278, 280 (1960) (addressing whether a specific transfer to a taxpayer should be characterized as a gift or as income). Here, however, Pleshaw's computations were transparent, the taxonomy that he employed was neither complex nor sophisticated, and he appears to have given the defendant the benefit of every plausible doubt.

calculations here were both straightforward and transparent. Accordingly, it was within the district court's discretion to allow Pleshaw to testify without first qualifying him as an expert witness.

That ends this aspect of the matter. Nothing in the record indicates that Pleshaw's testimony crossed the line or morphed into an opinion about the defendant's intent. Pleshaw simply did the math. The defendant's claim of error is, therefore, unavailing.

### E. Sentencing.

Under the federal sentencing guidelines, a defendant's sentence in a tax evasion case is influenced by the amount of unpaid taxes attributable to the evasion. See USSG §§2T1.1, 2T4.1. At the disposition hearing, the district court found the tax deficiency to be $458,587. That finding resulted in a significant upward adjustment of the defendant's base offense level and, in combination with his criminal history category, yielded a guideline sentencing range of 46-57 months. The district court proceeded to sentence the defendant at the bottom of the range.

On appeal, the defendant strives to convince us that the district court lacked constitutional authority to make this tax-loss finding. In his view, any fact resulting in a higher guideline sentencing range must be determined by a jury beyond a

reasonable doubt, not determined by a sentencing court under a preponderance-of-the-evidence standard. We are not persuaded.

In this regard, the defendant relies on a line of Supreme Court cases establishing the basic principle that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." United States v. Booker, 543 U.S. 220, 244 (2005); accord Blakely v. Washington, 542 U.S. 296, 304-05 (2004); Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). His reliance is misplaced.

The federal sentencing guidelines are now advisory. See Booker, 543 U.S. at 264. Thus, the fact at issue merely increases a recommended guideline sentence. That recommended sentence, though higher, is still well within the applicable statutory maximum for the crimes of conviction. See 26 U.S.C. § 7201 (setting maximum penalty of five years in prison for each count of tax evasion). After Apprendi but before Booker, we held that such an increase did not trigger Sixth Amendment concerns. See United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001) (explaining that "Apprendi simply does not apply to guideline findings . . . that increase the defendant's sentence, but do not elevate the sentence to a point beyond the . . . applicable statutory maximum"). By making clear that the federal sentencing guidelines should be

treated as advisory, <u>Booker</u> settled that proposition beyond hope of contradiction. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68, 75 (1st Cir. 2005).

The logic of <u>Booker</u> is controlling here. The district court's post-verdict finding of a specific tax deficiency was highly relevant to the determination of the recommended sentence, <u>see</u> USSG §§2T1.1, 2T4.1, but it did not in any way increase the statutory maximum sentence to which the defendant was exposed. Accordingly, the district court's use of that finding in formulating the defendant's actual sentence was unimpugnable. <u>See</u> <u>United States</u> v. <u>Maken</u>, 510 F.3d 654, 660-61 (6th Cir. 2007).

## III. CONCLUSION

We need go no further. For aught that appears, the defendant was fairly tried, justly convicted, and lawfully sentenced.

**Affirmed**.

-22-