# United States Court of Appeals
## For the First Circuit

Nos. 11-2295, 11-2359

UNITED STATES,

Appellee,

v.

MICHAEL POWERS; JOHN MAHAN,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Stahl, Circuit Judges.

Dana A. Curhan for appellant Michael Powers.
Robert L. Sheketoff, with whom David R. Yannetti was on brief,
for appellant John Mahan.
Vassili N. Thomadakis, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

December 14, 2012

**LYNCH**, **Chief Judge**.  Michael Powers and John Mahan, who ran an employment agency from 1998 to 2004 supplying temporary workers, were both convicted after an eight-day jury trial of conspiracy to defraud the United States by impeding the functions of the Internal Revenue Service ("IRS") and mail fraud.  Powers was also convicted of subscribing false tax returns and Mahan of procuring false tax returns.  All told, the tax fraud amounted to $7,592,003.55.  As part of the fraud, they underreported the amount of the payroll to the agency's workers' compensation insurance carriers.  Powers is serving a total term of imprisonment of 84 months; Mahan, a term of 76 months.  Each was ordered, jointly and severally, to pay total restitution of $8,805,277.36 to the IRS and two insurance carriers.

Their appeals do not contest the sufficiency of the evidence but rather allege that there were serious errors at trial which require that they be given a new trial.

There is a common theme to the arguments: that each error undercut a major theory of defense.  The theory was that they in good faith believed their agency, Commonwealth Temporary Services ("CTS"), was not an employer of any of the temporary workers and that they did not knowingly defraud the government of payroll taxes by paying the workers in cash and not reporting their payments to the government or to the insurers.  They pointed out that they conceded that payments were made in cash, that no Forms W-2 were

-2-

given to the workers, that no Forms 1099 were given to anyone, including their recruiters and subcontractors, and that Federal Insurance Contributions Act ("FICA") tax was not withheld. Their position was that CTS was no more than a broker for the hiring company which needed the workers and that CTS was not the employer who owed the taxes; rather, the CTS subcontractors were.

Most seriously, they complain that the trial judge failed to give a defense instruction on advice of counsel, inappropriately placing too high a burden on them to justify the instruction. They also assert that various witnesses were allowed to testify as to the ultimate issues, invading the role of the jury, and they should have been allowed to call witnesses to support their defense.

I.

Because there is no challenge to the sufficiency of the evidence, we do not recite it in the light most favorable to the verdict. United States v. Hardy, 37 F.3d 753, 755 (1st Cir. 1994). Rather, we provide a more neutral recitation to give context for the claims of error. United States v. Morla-Trinidad, 100 F.3d 1, 2 (1st Cir. 1996).

A.        CTS's Mode of Operation

In 1998, Powers and Mahan started CTS. CTS's Articles of Organization listed Powers and Mahan as the agency's sole directors, with Mahan as President and Powers as Treasurer and

Clerk. Before starting CTS, Powers and Mahan had both worked at another temporary employment agency, Daily A. King ("DAK").

CTS provided temporary workers to facilities such as warehouses and recycling plants to perform manual labor. CTS entered into contracts with client companies that set out the rates which the clients would pay CTS per worker hour. Clients called CTS to request a particular number of workers and CTS communicated the client order to "recruiters," some of whom had been temporary workers themselves before CTS approached them to recruit workers for CTS. CTS told the recruiters how many men and women were needed, what clothes the workers should wear, and how to get to the client facilities. The recruiters then found workers for CTS.

Powers set the workers' rate of pay and CTS informed the recruiters what the rate was. CTS did not ask recruiters how much it would cost to find workers, and recruiters did not provide a quote to CTS for how much workers would cost. Recruiters did not send CTS invoices for finding workers. CTS paid the recruiters a commission of fifty cents per hour for each worker, plus an extra fifty cents per hour if the recruiters transported the workers to the client company.

CTS provided client companies with blank timesheets that the clients filled out and returned to CTS each week. CTS then created invoices listing workers' names, the hours they worked, and the billing rate, and submitted them to clients. After CTS had

collected and added up the timesheets each week, Powers or Mahan wrote a check for the total amount, sometimes above $100,000, that would be cashed and the cash distributed to the workers. Powers and Mahan divided the cash into separate quantities for each recruiter and placed the cash in bags, working from paysheets that listed workers' names, the hours they worked, and their pay rate. Each bag was then given to a recruiter with a paysheet so the recruiters could pay the workers. CTS also paid recruiters and some CTS office workers in cash. Between January 1, 2000 and June 30, 2004, CTS cashed checks totaling $26,563,854.

B.        CTS's Failure to Pay Payroll Taxes or File Forms 1099

Employers report payroll paid to employees to the IRS each quarter using a Form 941. Employers pay FICA taxes, also known as payroll taxes, in connection with the filing of Form 941. The total payroll tax rate during the relevant period was 15.3% of an employee's wages; employers are to withhold half of the payroll tax amount from employees' paychecks, and to pay the other half themselves. Employers are also supposed to withhold federal income tax from employees' wages. CTS filed Forms 941, but it did not report the cash wages paid[1] and did not pay payroll taxes or withhold any taxes. Powers and Mahan did not instruct recruiters to withhold taxes from wages paid to temporary workers. Joseph

---

[1] CTS filed Forms W-2 disclosing wages paid to Powers, Mahan, and four or five other CTS employees, but did not file Forms W-2 for temporary workers or recruiters.

Guidoboni, a revenue agent in the IRS Special Enforcement Program, estimated at trial that the total tax due on the unreported payroll was $7,592,003.55.

When a company uses contract laborers rather than employees, it is still required to file a Form 1099 whenever it has paid an individual or unincorporated business more than $600 in a calendar year. In 2000, Powers and Mahan hired Joyce Christensen, a certified public accountant, to prepare their corporate and personal tax returns. Powers and Mahan told Christensen that $1,923,155 was to be deducted on CTS's tax return as contract labor, and that these contract laborers were temporary workers. Christensen told the defendants that CTS needed to file a Form 1099 for anyone classified as a contract laborer and explained how to determine if someone was an employee (requiring the filing of a Form W-2) or a contract laborer (requiring the filing of a Form 1099). Christensen sent a letter to the defendants on March 9, 2000, reiterating that "properly classified independent contractors should receive a Form 1099 at the end of each calendar year. If you fail to provide the proper forms, you could have exposure to a large tax liability." Christensen stopped working with the defendants for the 2000 tax year because they would not follow her advice. During the charged conspiracy period, from 2000 to 2005, CTS did not file any Forms 1099 with the IRS.

C.        CTS's Underreporting of Payroll to Insurance Carriers

With certain exceptions not relevant here, Massachusetts employers are responsible for maintaining workers' compensation insurance for everyone to whom the employer makes payments. Upon the expiration of each policy term, the insurance company audits the employer and reviews the employer's records to determine, inter alia, the actual remuneration paid by the employer to individuals and businesses during the previous year, including payments to subcontractors or contract labor. The audit then arrives at a final premium figure for the policy term that determines whether the employer owes additional money to the insurer or the insurer owes the employer a rebate.

CTS was audited by its workers' compensation insurance carriers several times. CTS failed to report all of its payroll to its auditors, resulting in its carriers underbilling it by more than $200,000 between June of 2000 and February of 2005.

D.        Powers' and Mahan's Statements in the DAK Investigation

In April of 2000, Powers met with Federal Bureau of Investigation ("FBI") agent Nancy McCormick and a representative of the U.S. Attorney's office to discuss the business practices of DAK, his previous employer. Powers explained that DAK was a temporary employment agency, and said that the majority of DAK's payroll involved off-the-books cash payments. Powers described how he cashed checks for DAK, and how this cash was then divided into

envelopes and given to "lieutenants" to distribute to temporary workers. Powers provided Agent McCormick with a hard drive containing Excel spreadsheets recording cash payments to temporary workers that were not disclosed on DAK's Forms 941, and also said that DAK's cash payments were designated as contract labor on DAK's tax returns. Powers stated that DAK's cash payments had not been reported to DAK's workers' compensation insurance carriers and that DAK had withheld no tax from these cash payments. Powers was the first person to meet with Agent McCormick and provide information about DAK, and he ultimately spoke with Agent McCormick five times between April of 2000 and May of 2001.

In 2002, Mahan met with Joel Burman, an IRS Criminal Investigation special agent, to discuss DAK. During Mahan's interview, he explained that DAK and its affiliated companies paid their employees with cash and used "managers" to recruit, pick up, transport, and pay their employees. Mahan stated that DAK underreported its payroll to its workers' compensation carriers in order to reduce its premiums.

Federal agents then obtained a search warrant on June 25, 2001 to search the offices of DAK and its affiliated companies. The investigation culminated in the indictment, trial, and conviction of DAK's owners for mail fraud, procuring false tax returns, and conspiring to defraud the United States of employment

and income taxes and to commit insurance fraud.  See United States v. McElroy, 587 F.3d 73, 74, 76 (1st Cir. 2009).

E.      Massachusetts Department of Unemployment Assistance Proceedings Against CTS

Massachusetts employers are required to contribute to the state unemployment assistance fund in an amount determined, in part, by how many employees they have.  Employers report the information upon which their contributions to employment assistance are based to the Massachusetts Department of Unemployment Assistance ("DUA") each quarter, and some employers are then selected to be audited.

In July of 2000, Roberta Davis of the DUA notified CTS that it had been selected for an audit focusing on CTS's operations during 1998.  CTS retained attorney Edward DeFranceschi with respect to the DUA matter.  On September 1, 2000, CTS provided Davis with a "transaction report" that reflected a number of cash disbursements.  During a follow-up meeting with Davis, DeFranceschi and Powers characterized the recipients of these disbursements as "subcontractors."

Davis requested additional "documentation, whether it's business cards, invoices, contracts, Yellow Pages, something to show me that these people are in business for themselves," as well as Forms 1099 and other back-up documentation.  Davis asked for more documentation about one of CTS's recruiters, Jose Gramajo, and his wife, Delmy Gramajo, who transported workers for CTS.

In February of 2000, DeFranceschi sent Davis a letter, with a copy to Powers, in which he stated:

> CTS routinely calls Delmy and Jose to handle certain jobs that it has acquired. Delmy and Jose, however, are not CTS employees. Each of them and several others quote a price. If the price is within the profit targets CTS quotes the customer, they complete the job and are paid.

On February 21, 2000, DeFranceschi sent Davis another letter stating that:

> You asked about invoices from the persons who had received large payments from Commonwealth Temp Services (CTS). I have enclosed three invoices from 1998 and a current invoice. . . . CTS solicits situations requiring unskilled labor. . . . If CTS successfully bids the job, it contacts various parties that it has done business with in the past and inquires if they are interested in doing the job at a fixed rate for labor and transportation. CTS usually finds someone to organize the labor for the job. The invoices I have enclosed represent the billing for the jobs to CTS. . . . Please note the detail in the February 4, 2001 invoice from K & S Comm & Domestic Services. The job, the labor and the transportation are all separately stated.

Two of the enclosed invoices purported to be from Delmy Gramajo. Powers had faxed the enclosed invoices to DeFranceschi on an undisclosed date with the note: "3 early and 1 recent invoice -- These are good representatives of the type of invoices we rec'd then and now."

In fact, Delmy Gramajo never submitted any invoices to CTS, much less the "invoices" that DeFranceschi provided to Davis. Neither did Jose Gramajo. The invoice that DeFranceschi identified as "from K & S Comm & Domestic Services" was actually a paysheet that CTS had originally provided to Jose Gramajo.

-10-

On April 6, 2004, the DUA issued a determination to CTS that twelve listed individuals "and others similarly employed" were "in 'employment,'" making "them your employee(s) and not independent contractor(s)."

CTS appealed and hearings were held on June 9, 2004 and July 1, 2004, which Powers, Mahan, and attorney DeFranceschi attended. Powers testified under oath that he did not know the "medium of payment" between the recruiters and the temporary workers; that for each new job he contacted the recruiters to solicit a price from them for which they would be willing to find workers; that the recruiters, at least initially, invoiced CTS for the services they performed; and that he did not have direct knowledge of the amount the temporary workers were paid. The DUA, in an undated decision signed by review examiner Scott E. Pachico, affirmed the determination that "an employer-employee relationship existed between [the listed] individuals [and others similarly employed] and Commonwealth Temporary Services, Inc." This decision made CTS liable for unemployment contributions for its temporary workers, and Powers and Mahan then shut down CTS's operations in December of 2004.

F.        Powers' Statements to IRS Criminal Investigators

During a 2006 interview with IRS Agent David Butka, Powers stated that CTS used "subcontractors," but had no contracts with these "subcontractors" and paid them in cash, which the

"subcontractors" paid to the workers.  Powers stated that the "subcontractors" requested that the payments be in cash and that he did not know whether the temporary workers were paid in cash. Powers said that the "subcontractors" initially submitted invoices to CTS but that CTS eventually began directly incorporating information from the "subcontractors" into its internal spreadsheets.

Powers admitted that CTS did not issue Forms 1099 to the "subcontractors," but insisted that accountants never discussed Forms 1099 with him and that he was not familiar with the Form 1099 filing requirements.

## II.

We treat each of the claims presented on appeal.

A.          Refusal to Give Advice-of-Counsel Instruction

Although the government, in its initial proposed jury instructions given to the district court on the fourth day of trial, requested that an advice-of-counsel instruction[2] be given,

_____

[2] The government's proposed instruction stated in part that:

You have heard evidence that the defendants received advice from a lawyer and you may consider that evidence in deciding whether the defendants acted willfully and with knowledge of wrongdoing.

The mere fact that the defendants may have received legal advice does not, in itself, constitute a complete defense.  Instead, you must ask yourselves whether the defendants:

(1)   honestly and in good faith sought the advice of a

this was apparently based on defense counsel's representation in his opening statement that he would call attorney DeFranceschi to testify that he advised the defendants that their position -- that neither recruiters nor temporary workers were employees of CTS -- was "litigable" and "reasonable." By day seven of trial, the defense had not called DeFranceschi, and the defense never did so. At the charge conference the government stated that it was withdrawing the request. Defense counsel asked that the instruction be given.

The district court decided not to give an advice-of-counsel instruction, giving two reasons: (1) "the defendants have presented no evidence that they fully advised Attorney DeFranceschi of their plan, received advice regarding that plan before 2000, and followed that exact advice in good faith"; and (2) "even if there were some basis for an advice of counsel instruction, that instruction is subsumed by the general good-faith instruction that the Court will give."

It is a basic tenet of criminal law that a defendant is entitled to an instruction on his theory of defense provided that

lawyer on legal questions about which they were in doubt;
(2) whether they fully and honestly laid all the facts before their lawyer; and
(3) whether in good faith they strictly followed such advice, relying upon it and believing it to be correct.

the theory is a legally valid one and there is evidence in the record to support it.  United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988) (instruction regarding entrapment).  In making this determination, the district court is forbidden from weighing the evidence, making credibility determinations, or resolving evidentiary conflicts.  Rather, the court must take the evidence in the light most favorable to the defendant, to see if the inferences and evidence can plausibly support the theory of the defense.  Id.

These same rules are used for the defense of good faith reliance on the advice of counsel.  See United States v. Christopher, 142 F.3d 46, 55 (1st Cir. 1998).  We review these determinations de novo.  See United States v. Howard, 687 F.3d 13, 18 (1st Cir. 2012); United States v. Sánchez-Bérrios, 424 F.3d 65, 76 (1st Cir. 2005); Rodriguez, 858 F.2d at 812.  This is different from the abuse of discretion standard in some other circuits.  See, e.g., United States v. Bush, 626 F.3d 527, 538-39 (9th Cir. 2010).  There is no claim the good-faith instruction was flawed.

Here, it was essential to the prosecution to show beyond a reasonable doubt that the defendants had knowingly committed the charged offenses.  The crimes with which defendants were charged required an intent to impede or defraud, or wilfully making or aiding a false representation.  See United States v. Mubayyid, 658 F.3d 35, 57 (1st Cir. 2011) (conspiracy to defraud the IRS); United States v. Stergios, 659 F.3d 127, 132 (1st Cir. 2011) (mail fraud);

26 U.S.C. § 7206(1) (subscribing false tax returns), (2) (procuring false tax returns). If the defendants had acted pursuant to advice of counsel, this would have been very useful evidence for them of lack of fraudulent intent or wilfulness. See United States v. Ibarra–Alcarez, 830 F.2d 968, 973 (9th Cir. 1987).

The circuits have provided some guidance as to the types of facts which will warrant giving an advice-of-counsel instruction. Some have suggested a defendant must show that he or she fully disclosed all material facts to his/her attorney before the advice was given, that the attorney gave that advice, and that the defendant actually relied on counsel's advice in a good faith belief that his/her conduct was lawful. See Bush, 626 F.3d at 539; United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006). We have been clear that the defense "is not available to one who omits to disclose material information to advisors or dictates imprudent outcomes to advisors." Janeiro v. Urological Surgery Prof'l Ass'n, 457 F.3d 130, 140 (1st Cir. 2006). That principle disposes of this claim.

At trial, the defendants chose not to testify and not to call DeFranceschi -- whom they first consulted in 2000 to represent them before the DUA -- as a witness. The prosecution introduced exhibits demonstrating that Powers had faxed phony invoices to DeFranceschi and represented to him that they were "good representatives of the type of invoices we rec'd then and now" from

-15-

recruiters. The government also introduced evidence that DeFranceschi represented to Davis, copying Powers, that CTS's recruiters "quote a price. If the price is within the profit target CTS quotes the customer, they complete the job and are paid." DeFranceschi would have no first-hand knowledge of this and was likely repeating representations made to him. Legal advice made based on material misrepresentations to counsel does not qualify for the defense. There was no evidence that Powers corrected this statement, which he knew to be a misrepresentation.

Defendants assert that "[i]t is clear from the record evidence that Attorney DeFranceschi knew the material facts about the CTS business model and advocated that the model was appropriate." They have pointed to no evidence that this was so, that DeFranceschi advised them that their actions were legal, or that they relied on such advice. In light of the evidence that attorney DeFranceschi was not told needed information and was given false information, the instruction was unavailable.

We add that the ample good-faith instructions cured any possible harm to the defendants. The good-faith instructions given were as follows: concerning the general meaning of "knowingly": "[i]f the defendant acted in good faith . . . that is a defense to the charge that he acted in a knowingly criminal manner"; concerning the mail fraud charge: "if the defendant acted in good

faith, he cannot be guilty of the crime"; and concerning the charges of subscribing or procuring false tax returns:

> if the defendant then under consideration in good faith believed that he paid all the taxes he owed, he cannot be guilty of criminal intent to evade taxes. Therefore, if you find that the defendant then under consideration honestly believed that he owed no taxes, even if that belief was unreasonable or irrational, then you should find him not guilty. However, you may consider whether the defendant's belief was actually reasonable as a factor in deciding whether he held that belief in good faith.

These instructions adequately conveyed that an absence of intent to defraud, or an honest belief that taxes were not owed, would shield defendants from conviction. The defendants have not argued that the instructions would not encompass a situation in which their good-faith belief was based on the advice of counsel. We do not suggest that the presence of a good-faith instruction invariably eliminates the need for a court to consider an advice-of-counsel instruction. But here, there could have been no prejudice to defendants. See United States v. Allen, 670 F.3d 12, 15 (1st Cir. 2012).

B.    Admission of Testimony on Conclusions Purportedly Related To Ultimate Issues

We review a trial court's rulings admitting or excluding evidence for abuse of discretion where the appellant lodged a contemporaneous objection on the proper ground; where no such objection was made, we review these rulings for plain error. United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003).

1.    Testimony of IRS Agent Guidoboni

Agent Guidoboni was called as a summary witness who presented calculations of the payroll taxes due and owing after examination of voluminous exhibits.  In the course of this, he referred to the cash payments as "cash payroll."  Defendants filed an unsuccessful pretrial motion in limine to exclude Agent Guidoboni's testimony and renewed it at trial, again unsuccessfully.  Defendants argue that the agent's characterization of the cash distributions to workers as "unreported payroll" was improper.  They say this was a legal conclusion reserved to the jury.

The objection is foreclosed by United States v. Stierhoff, 549 F.3d 19 (1st Cir. 2008), and United States v. McElroy, 587 F.3d 73 (1st Cir. 2009).  Indeed, in McElroy we approved exactly this type of testimony, and Guidoboni was the witness there, as well.  587 F.3d at 81-83.  IRS agents may testify as summary witnesses in tax evasion cases to "analyze facts already introduced into evidence and spell out the tax consequences that necessarily flow from those facts."  Stierhoff, 549 F.3d at 28. One "limitation on this type of evidence is that the agent may not testify about the defendant's state of mind."  United States v. Mikutowicz, 365 F.3d 65, 72 (1st Cir. 2004).  Nor may he testify as to the meaning of provisions of the Internal Revenue Code.  Id. at 73.  Agent Guidoboni did neither.

Agent Guidoboni "ma[d]e assumptions concerning the proper attribution of the income from the transactions in this case" in identifying the tax consequences of these transactions, but his assumptions were supported by evidence in the record. United States v. Diez, 515 F.2d 892, 905 (5th Cir. 1975). Agent Guidoboni calculated CTS's cash payroll by adding the value of the checks CTS cashed during this period. His method was supported by the testimony of Manuel Deaguiar, CTS's office manager, that CTS cashed checks in order to pay recruiters and temporary workers and the fact that his figure roughly matched CTS's own deductions, reported to the IRS, for "contract labor" over this period.

Agent Guidoboni then calculated the taxes owing on this amount by assuming that these payments went to workers who were CTS employees. This assumption was supported by testimony at trial that defendants: (1) controlled where and when recruiters and temporary workers worked; (2) determined how much recruiters and temporary workers earned; (3) distributed cash to recruiters for direct payment to recruiters and temporary workers; (4) addressed problems that client companies had with temporary workers; (5) addressed temporary workers' complaints about their pay; (6) oversaw treatment of injured temporary workers; (7) had no contracts with recruiters; and (8) permitted recruiters and temporary workers to quit at any time. See 26 U.S.C. § 3121(d) (defining employee as "any individual who, under the usual common

law rules applicable in determining the employer-employee relationship, has the status of an employee"); Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24 (1992) (enumerating thirteen-factor common-law test for determining whether a hired party is an employee); Rev. Rul. 87-41, 1987-1 C.B. 296 (enumerating twenty factors to consider in determining whether an individual is an employee or an independent contractor). Further, Agent Guidoboni explicitly conceded that his analysis rested on this assumption and defense counsel cross-examined him on this point. The district court did not abuse its discretion in admitting Agent Guidoboni's testimony.

2.    Testimony of Deaguiar, Novick, Brady, McKenna, Soto, and Davis

Defendants challenge the testimony of several witnesses on the basis that they "expressed legal or factual conclusion[s] on key disputed issues that should have been left to the jurors." A lay witness may offer an opinion so long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; see also United States v. Sanabria, 645 F.3d 505, 515-16 (1st Cir. 2011). "An opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).

Deaguiar over objection described the individuals who recruited temporary workers for CTS as "recruiters." Defendants argue that this term "strongly suggested the conclusion that the government was attempting to prove." Deaguiar's term accurately describes what these "recruiters" did for CTS, and he testified that Powers and Mahan themselves used this term. Deaguiar also testified that defendants used the terms "'recruiters' and 'independent contractors' . . . interchangeably." His testimony was not on any ultimate conclusion.

Defendants argue that Bruce Novick, an accountant who prepared tax returns for Mahan and Powers between 2000 and 2004, expressed the opinion that the only legitimate reason for CTS not to file Forms 1099 would be on the condition that CTS was paying the claimed amounts to corporations. Defendants overread Novick's testimony. In reality, Novick merely testified, over objection, that (1) payments in excess of $600 to individuals who are not corporations require filing of a Form 1099, and (2) Powers told him CTS was not filing Forms 1099 because the payments for contract labor were to other corporations. Neither statement invaded the province of the jury.

John Brady, plant manager and human resources manager at a CTS client, testified, over objection, that his understanding was that temporary workers "work for the agency that I'm hiring them through." He did so only after testifying that the temporary

workers were not employees of his company. Mahan argues that this was inadmissible opinion testimony on the ultimate factual issue in the case. We see no abuse of discretion. Brady merely stated his understanding of whom the temporary workers "worked for," and did not attempt to explain the legal significance of this understanding.

Andrea McKenna, a human resources manager at another CTS client, testified, over objection, that she understood that the recruiters "worked for" CTS. Defendants challenge this testimony for reasons similar to those advanced regarding Brady's testimony. Admitting this testimony was likewise not an abuse of discretion.

Mahan also argues that McKenna "opine[d], over the defendant's objection, that with temporary workers the agency was responsible for the payroll taxes." She did so after testifying that temporary workers were not on the payroll of her company. Mahan argues that she should not have been permitted to go further, that the jury was in a better position to decide this, and that her views were not helpful to the jury. To the extent that McKenna expressed an opinion, it helped the jury understand why clients pay a premium to temporary employment agencies. Further, the contract between CTS and this client -- which was introduced without objection -- stated that CTS "will pay all applicable local, state and federal payroll taxes on all labor provided." McKenna's testimony buttressed that the parties' conduct was consistent with

the contract. It could not have been prejudicial to the defendants.

Jose Soto, a recruiter for CTS, testified, over objection, that he did not consider himself an independent contractor. He explained that he understood an independent contractor to be "somebody who works for himself and pays his own taxes," and stated that he was not such a person because CTS was "paying me in cash." To the extent that this statement offered a lay opinion, it was helpful to the jury and the criteria on which Soto relied were explicit and subject to attack. Indeed, defense counsel cross-examined Soto on this subject, eliciting that "you knew that the term 'independent contractor' meant that you were responsible to pay your own taxes" and that "if you admitted you were an independent contractor . . . that would not be a very good thing for you."

Defendants challenge as inadmissible Davis's testimony that temporary employment agencies often provided inaccurate information to the DUA. In a separate argument, defendants also argue that the court erred in (1) permitting Davis to testify that certain individuals, including Delmy Gramajo and Jose Gramajo, were employees of CTS; and (2) refusing to permit defense counsel to cross-examine Davis about this conclusion.

Davis testified, over objection, that temporary employment agencies "don't always give you the correct amount of

names and numbers." Defendants argue that in eliciting this testimony "the government asked the jurors to assume, based on the past experiences of Ms. Davis with other companies in the same business, that CTS and its agents were engaged in the same pattern of wrongful conduct." While "[t]he threat of guilt by association is perhaps greatest where the defendant has done little but is closely associated with others already known to have been convicted," Allen, 670 F.3d at 16, it is a leap too far to find that threat here. Davis did not testify that furnishing incorrect names or numbers to the DUA, without more, could constitute "wrongful conduct" warranting conviction, and she did not claim that defendants were closely associated with persons who had committed wrongful conduct. Instead, her testimony helped the jury understand why lengthy DUA audits were sometimes necessary. And there was ample evidence that defendants had submitted inaccurate reports, rendering this testimony harmless. The court did not abuse its discretion in admitting this testimony.

On the second point, Davis did agree that "the individuals you highlighted, including Delmy Gramajo and Jose Gramajo, were employees," but she did so in response to a question from defense counsel. "[A]n 'attorney can . . . waive his client's right to raise an error on appeal by deliberately eliciting or relying on inadmissible evidence,'" United States v. Vachon, 869 F.2d 653, 658 (1st Cir. 1989) (second alteration in original)

(quoting J. Weinstein & M. Berger, Weinstein's Evidence ¶ 103 [02] (1988)). Defense counsel did just that here for sensible tactical reasons: to elicit from Davis that attorney DeFranceschi indicated he "did not agree with that assessment and that these people, including Delmy Gramajo and Jose Gramajo, were subcontractors."

As for the challenge to restrictions on the cross-examination of Davis, "[w]e review this challenge de novo to determine whether defense counsel was afforded a reasonable opportunity to impeach adverse witnesses. Should that threshold be reached, any restrictions that were placed on the extent and manner of the cross-examination will be reviewed for abuse of discretion." Mikutowicz, 365 F.3d at 72-73 (citations omitted). Defense counsel were afforded ample opportunity to cross-examine Davis about her conclusion that Delmy Gramajo and Jose Gramajo were CTS employees. Defense counsel were permitted to ask Davis whether a number of factors -- including that Jose Gramajo had business cards, had registered businesses at city hall and with a contractors association, "was running" between six and twelve passenger vans to transport workers, owned a garage to maintain these vans, could accept or reject job requests, and actually paid temporary workers -- would have been relevant to her determination.

The district court sustained objections to only three defense questions, and its rulings did not meaningfully constrain the defense's cross-examination of Davis. Further, to the extent

the district court refused to permit defense counsel to question Davis about the legal test for identifying independent contractors, it "impose[d] reasonable limits on cross-examination in order to avoid confusion of the issues," id. at 72 (quoting United States v. Gonzalez-Vazquez, 219 F.3d 37, 45 (1st Cir. 2000)).  "[I]t is for the judge, not the lawyers or the witnesses, to inform the jury of the law applicable in the case. . . ." Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997).

C.      Exclusion of Pachico's Testimony and Draft Opinion

Powers and Mahan sought to introduce the testimony and draft decision of DUA Hearing Officer Pachico, who conducted two hearings and prepared a draft opinion.  That early, non-final draft tentatively concluded that it had not been shown that an employee-employer relationship existed between CTS and certain workers.  The DUA ultimately determined that these certain workers were CTS employees, contrary to Pachico's preliminary conclusion.

The standard of review is not favorable to defendants. Before trial, the government moved to exclude testimony by Pachico about the DUA hearings, as well as Pachico's draft opinion.  The district court provisionally granted the government's motion as to Pachico's testimony and definitively granted the motion as to Pachico's draft opinion.  At trial defendants did not renew their objection to the government's motion and did not attempt to introduce Pachico's testimony.  Because defendants failed to

-26-

preserve the issue, review of the district court's provisional ruling regarding Pachico's testimony is for plain error. See United States v. Raymond, 697 F.3d 32, 38 (1st Cir. 2012); United States v. Whitney, 524 F.3d 134, 140 (1st Cir. 2008). We review the district court's definitive ruling regarding Pachico's draft opinion for abuse of discretion. See Fusco v. General Motors Corp., 11 F.3d 259, 262-63 (1st Cir. 1993).

There was very limited evidence as to the DUA proceedings put in by the prosecution. That evidence pertained to Powers' and DeFranceschi's statements in response to Davis's requests for information and Powers' testimony before the DUA. Indeed, the conclusion of the DUA was not admitted, so it is difficult to see how a preliminary draft opinion could be admissible under the rule of completeness. See United States v. Millan, 230 F.3d 431, 434 (1st Cir. 2000). Further, the evidence was that the preliminary draft's conclusion was itself based on factual misrepresentations.

The district court quite correctly concluded that further inquiry in this area would have resulted in a mini-trial sideshow which would have distracted attention from the real issues in the trial. That is true, whatever minimal value the preliminary draft (soon reversed by the final opinion) would have had in shoring up defendants' good faith argument. To the extent that defendants are arguing that the purpose of the offered preliminary draft was not for its conclusion, but only for Pachico's personal conclusions

-27-

about the defendants' good faith, that latter purpose was impermissible.  In a criminal case, "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense" is "for the trier of fact alone."  Fed. R. Evid. 704(b).

One more observation: admitting Pachico's draft opinion likely would have harmed defendants under the very doctrine of completeness they rely on.  Had the preliminary draft come in, it would have laid the basis for the admission of the final draft affirming that certain workers were CTS employees.  Defendants' argument would fail even if all issues had been preserved.

### III.

We affirm the defendants' convictions and sentences.