MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2015 ME 149
Docket:       Cum-14-442
Argued:       September 16, 2015
Decided:      November 19, 2015

Panel:        ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.


STATE OF MAINE

v.

JODY B. FLYNN


ALEXANDER, J.

[¶1]  Jody B. Flynn appeals from a judgment of the trial court (Cumberland County, *Wheeler, J.*) convicting her of theft by unauthorized taking or transfer, (Class B), 17-A M.R.S. § 353(1)(B)(1) (2014), following a jury trial.  On appeal, Flynn contends that the record contains insufficient evidence to support her conviction.  Flynn also asserts that the trial court erred in (1) admitting in evidence several emails between Flynn and representatives of the named victims; (2) shifting to Flynn the burden of proof when giving an advice-of-counsel instruction; (3) denying Flynn's motion to require the State to provide a bill of particulars, U.C.D.R.P.–Cumberland County 16(c)(1); M.R. Crim. P. 16(c)(1),[1] to assist in preparation of her defense; and (4) proceeding on a duplicitous

---

[1]  The Maine Rules of Unified Criminal Procedure (effective Jan. 1, 2015) were not in effect at the time of these proceedings.  *See* M.R.U. Crim. P. 1.

single-count indictment that did not require the jury to separately determine the extent of the theft, if any, from each of the three corporate victims named in the indictment.

[¶2] After review of the record and the arguments of counsel, we determine that the evidence is sufficient to support the Class B theft conviction, and we discern no error in the points argued by Flynn that would justify vacating the conviction. Accordingly, we affirm the judgment of conviction.

## I. CASE HISTORY

[¶3] On February 9, 2012, Jody B. Flynn was indicted for Class B theft by unauthorized taking or transfer, 17-A M.R.S. § 353(1)(B)(1). Because the terms of the indictment are important to our discussion of principal issues on appeal, we quote from it at the outset of the case history. The indictment stated:

> From on or about December 7, 2009, through on or about January 27, 2010, . . . Flynn did commit theft pursuant to one scheme or course of conduct by obtaining or exercising unauthorized control over the property of Greentree Renewable Energy, Inc.,[2] Guangzhou Dinson Engineering & Trading Limited, or Charmwell Holdings Limited, such property consisting of money having a value in excess of $10,000, with intent to deprive the owners thereof.

[¶4] Viewing the evidence in the light most favorable to the State, the following facts were established beyond a reasonable doubt at trial. *See State v. Reed*, 2013 ME 5, ¶ 9, 58 A.3d 1130.

---

[2] It appears from the record that the company's name was Green Tree Renewable Energy, LLC, although it is sometimes misstated in the record.

[¶5]   At some time in 2009, Flynn and Bert Martin formed Green Tree Renewable Energy, LLC.  The purpose of creating the business was to obtain financing and facilitate the purchase of a pulp and paper mill in Baileyville[3] owned by a company called Domtar.  Flynn's role was to "look[] after the finance[s]." Bert Martin's role was to do "everything else," including seeking a buyer. Eventually, Bert Martin located a potential buyer: initially, it was a company called Grosford Point Limited, located in Singapore.  Mike Martin, who has no apparent relation to Bert Martin, represented Grosford as its attorney in fact.

[¶6]   Mike Martin, Bert Martin, and Flynn executed a written agreement dated October 8, 2009, for Grosford to buy the mill.  The agreement stated that Grosford would "advance to [Green Tree] all sums necessary to fund any deposits required by Domtar and all due diligence and legal costs in connection with the Acquisition," and that "[a]ny unused funds and returns of deposits . . . shall be returned by [Green Tree] to Grosford promptly upon receipt by [Green Tree]."

[¶7]   After the agreement was signed, Mike Martin notified Bert Martin that a company called Dinson would be purchasing the mill instead of Grosford. Domtar required a $500,000 exclusivity or good-faith deposit for the purchase. Bert Martin testified that the "$500,000 was supposed to be put in a bank account and was supposed to be transferred [to Domtar] the day [the parties] agreed that the

---

  [3] Baileyville is the town where the pulp and paper mill is located.  In the trial court proceedings, the mill was referred to as both the "Woodland mill" and the "Baileyville mill."

sale was happening." On November 24, 2009, Christine Yu, a Dinson representative, emailed Flynn, stating:

> 1) Exclusivity deposit
> A fund transfer of $500,000 is coming your way tomorrow (24 November) from Asia. This is for the Exclusivity deposit for Domtar that is to be paid on Friday 27 November.

The next day, Green Tree's Bank of America account received the $500,000 from Charmwell Holdings, Dinson's holding company.

[¶8] Nine days later, on December 4, 2009, Flynn and Bert Martin learned that Domtar was backing out of the sale. On December 7, 2009, Mike Martin directed Flynn to return the $500,000 to Charmwell and stated that he would transfer funds to Green Tree to cover pending bills. Flynn responded by email on December 9, 2009, stating that she was "assembling our payables." Despite receiving emails from Mike Martin and Yu, Flynn did not email either of them again until December 18, 2009. On that date, Flynn emailed that she would "cover accounts payable with present funds and . . . send the remaining balance." Yu and Mike Martin continued to email Flynn with questions, but she did not respond to their emails or send Charmwell or Dinson any of the funds.

[¶9] On December 28, 2009, Bert Martin called Flynn regarding the delayed repayment. Flynn assured Bert Martin that "all the bills would be paid and the fund would be returned the next day." On January 3 and 4, 2010, Flynn sent emails to Mike Martin, Bert Martin, and Yu alleging that the bank was struggling

to complete the transfer of the funds and stating that she would "stay at the bank until they get this done." In response to more emails, she also cited holiday delays, family gatherings, and her busy schedule as preventing her return of the funds.

[¶10] On January 8, 2010, Flynn told Yu that the "balance" after accounts payable was $264,604.14. Yu, Mike Martin, and Bert Martin continued to email and call Flynn seeking more information about the accounts payable and the transfer of the funds. Eventually though, Flynn stopped responding to their emails and phone calls.

[¶11] Despite acknowledging an obligation to return at least $264,604.14 to the prospective purchasers, during December of 2009 and January of 2010, Flynn transferred most of the $500,000 exclusivity deposit from the Green Tree Bank of America account to her personal accounts, including an account Flynn shared with her college-age child and an account for her other business.

[¶12] Following the cessation of communications between Flynn and representatives of Charmwell and Dinson regarding return of the exclusivity deposit money, the record is unclear as to exactly what occurred. It appears, however, that Bert Martin repaid the sums due from Green Tree to Charmwell and/or Dinson.[4] Thereafter, sometime in 2010, Bert Martin brought a civil action against Flynn to recover the sums due. In the course of the civil action, Bert

---

[4] Counsel at oral argument indicated that such a payment had been made. In addition, after conviction, Flynn was ordered to pay restitution to Bert Martin.

Martin deposed Flynn twice regarding the same events. At the second deposition, Bert Martin confronted Flynn with her bank records—presumably the same bank records introduced as exhibits in this action. The pleadings and related exhibits from the civil case were part of the discovery provided to Flynn by the State in this case.

[¶13] At some point, the matter was reported to the State as a crime. Flynn was indicted for Class B theft in February 2012. On March 29, 2012, Flynn pleaded not guilty to the charge. On August 1, 2013, Flynn filed a motion seeking to compel the State to produce a bill of particulars. After a hearing, the court (*Cole, J.*) denied the motion.

[¶14] From August 11, 2014, to August 15, 2014, the court (*Wheeler, J.*) held a jury trial. Before the start of trial, the State filed a motion in limine seeking admission of certain email exhibits, mainly consisting of messages between Flynn and various representatives of Dinson arranging for a funds transfer. In its motion, the State argued that the statements were not hearsay because they would be offered for the fact that the statements were made and not the content of the statements themselves. In a hearing directly before trial, the court addressed State's exhibit 3, which consisted of a chain of emails, and the court stated that it would admit the exhibit "not for the truth of the matter." The court did not address the other email exhibits. When the court admitted State's exhibit 3 later that day, it

advised the jury that "it is not admitted to prove the truth of the matters asserted here, it is simply to explain the understanding that each of the respective participants in the conversation have about the issues they were discussing." With regard to the other email exhibits, the court simply admitted the exhibits without providing a limiting instruction.

[¶15] Also during trial, Flynn presented testimony from an attorney with whom Flynn had consulted and who had provided Flynn with legal advice about the status of the exclusivity deposit.

[¶16] On August 15, 2014, the jury found Flynn guilty of Class B theft by unauthorized taking or transfer, 17-A M.R.S. § 353(1)(B)(1). On August 25, 2014, Flynn filed a motion for judgment of acquittal, which the State opposed. The court denied the motion on September 29, 2014. The court then sentenced Flynn to four years in prison, with all but nine months suspended, to be followed by three years of probation. Flynn then brought this appeal.

## II. LEGAL ANALYSIS

[¶17] With this history, we proceed to address the issues on appeal.

A.    Sufficiency of the Evidence

[¶18] To support the jury's verdict of guilty of theft by unauthorized taking or transfer, the record must support a finding that Flynn "(1) obtained or exercised unauthorized control (2) over the property of another (3) with the intent to deprive

the owner of that property." *State v. Cook*, 2010 ME 85, ¶ 10, 2 A.3d 333; *see also* 17-A M.R.S. § 353(1)(A) (2014). To enhance the theft to a Class B offense, the State had to prove that Flynn had exercised unauthorized control over property having a value of at least $10,000. *See* 17-A M.R.S. § 353(1)(B)(1). There appears no serious dispute that Flynn applied to her own use at least $10,000 in funds originally supplied to Green Tree by Dinson and Charmwell. The issue is whether this use of funds constituted a theft.

[¶19] We addressed another example of a misapplication of funds in *State v. Schmidt*, 2008 ME 151, ¶¶ 20-21, 957 A.2d 80. There, we concluded that there was sufficient evidence to prove theft by unauthorized taking or transfer when the defendant "misused the money from the loan fund for personal purposes" because, despite the fact that "the checks to [the defendant] were made out to the Foundation, the State established that [the defendant] was the only person who had the right to draw funds on the account in which loan funds were deposited . . . [and] that [the defendant] did not use the money for the purposes intended." *Id*. ¶ 21.

[¶20] Here, the State presented sufficient evidence that the funds were "[p]roperty of another," *see* 17-A M.R.S. § 352(4) (2014) (defining "[p]roperty of another" as including "property in which any person . . . other than the actor has an interest that the actor is not privileged to infringe, regardless of the fact that the

actor also has an interest in the property"), and that Flynn, knowing that the funds belonged to "another," intentionally converted those funds entrusted to her corporation to her own use, *see* 17-A M.R.S. § 353(2) (2014) (defining "exercises unauthorized control" as including conversion).

[¶21]  First, the State presented the agreement between Green Tree and Grosford, Dinson's predecessor, which, anticipating the exclusivity deposit, specified that "Grosford shall advance to [Green Tree] all sums necessary" and "[a]ny unused funds" were to be "returned by [Green Tree] to Grosford promptly upon receipt by [Green Tree]."  Second, the State presented and the court admitted in evidence numerous emails in which Flynn acknowledged that the funds were Dinson's.  Further, the State presented portions of Flynn's depositions where Flynn first claimed that she loaned herself money from the Green Tree account, and later stated that she was protecting the money.  Finally, the State presented bank records showing that Flynn transferred Dinson's funds from the Green Tree account to her own personal and business accounts.  This evidence was more than sufficient to support Flynn's conviction.

B.    Use of the Emails

[¶22]  The emails at issue principally consist of messages between Flynn and various representatives of Dinson arranging for the funds transfer and statements by Flynn herself, acknowledging an obligation to return the funds and stating that

she would return the funds once bank and wire transfer technicalities were resolved. Flynn's own email statements or email communications, like other statements by criminal defendants, were not hearsay and were properly admitted pursuant to M.R. Evid. 801(d)(2) (Tower 2014).[5] The emails to Flynn from Mike Martin, Bert Martin, and Yu were not offered for the truth of the matters asserted therein but instead showed the context of Flynn's statements. *See* M.R. Evid. 801(c) (Tower 2014).[6] Because the emails were admissible pursuant to Rule 801(c) and (d)(2), and because the court properly instructed the jury to limit the scope of its consideration of the additional emails, the court did not abuse its discretion in admitting the emails.

## C. Advice-of-Counsel Instruction

[¶23] Flynn argues that she was entitled to a jury instruction on the defense of "advice of counsel," *see United States v. Powers*, 702 F.3d 1, 8-10 (1st Cir. 2012), but that the instruction given improperly shifted to her the burden of proof. We have not had occasion to address an advice-of-counsel defense or instruction. In federal courts, to establish an affirmative defense of advice of

---

[5] M.R. Evid. 801(d)(2) (Tower 2014), applicable when this case was tried, has since been replaced (effective Jan. 1, 2015) with restyled language that does not affect its application in this case. *See* M.R. Evid. 801(d)(2).

[6] M.R. Evid. 801(c) (Tower 2014) has since been replaced (effective Jan. 1, 2015) with restyled language that does not affect its application in this case. *See* M.R. Evid. 801(c).

counsel, the "defendant has a burden of production to establish a prima facie defense of advice of counsel," and must establish that:

> (1) before taking action, (2) he in good faith sought the advice of an attorney whom he considered competent, (3) for the purpose of securing advice on the lawfulness of his possible future conduct, (4) and made a full and accurate report to his attorney of all material facts which the defendant knew, (5) and acted strictly in accordance with the advice of his attorney who had been given a full report.

*United States v. Gorski*, 36 F. Supp. 3d 256, 267 (D. Mass. 2014); *see also Powers*, 702 F.3d at 10 ("In light of the evidence that [the] attorney . . . was not told needed information and was given false information, the instruction was unavailable."); *United States v. Gonzales*, 58 F.3d 506, 512 (10th Cir. 1995) ("Reliance upon advice of counsel is a defense that the defendant must establish. Reliance upon advice of a lawyer does not negate willfulness unless the defendant completely disclosed all material fact[s]." (citation omitted)). Once the defendant makes a prima facie case, "[t]he defendant [is] then . . . entitled to the requested instruction, and the [prosecution's] burden to prove every element of the offense beyond a reasonable doubt, including the necessary mens rea, would encompass the burden to prove that [the] defendant did not reasonably rely on counsel's advice." *Gorski*, 36 F. Supp. 3d at 267.

[¶24] An attorney called by Flynn at trial testified that Flynn had consulted with him about holding the funds until the dispute about the money could be resolved. The attorney also testified that (1) he was not aware of who had

provided the money that was placed in the Green Tree account; (2) he had not reviewed the agreement or agreements between Dinson and Green Tree; (3) "as far as [he] could see" from what was disclosed to him, the money "was not escrow money"; (4) Flynn had not told him that she had agreed to return the money, with a list of payables, to the investor; and (5) he had not been consulted about transferring funds from the Green Tree account to other accounts under Flynn's personal control. The attorney also testified that intentionally taking money from the business for personal use without authorization to do so is "a problem."

[¶25]  With this record, it is evident that Flynn did not establish that she had "made a full and accurate report to [her] attorney of all material facts [that she] knew . . . and acted strictly in accordance with the advice of [her] attorney who had been given a full report." *Gorski*, 36 F. Supp. 3d at 267.  Accordingly, the advice-of-counsel defense was not generated, and no instruction regarding advice of counsel should have been given. *See id.*; *Powers*, 702 F.3d at 10.

[¶26]  The question remains as to whether the court committed reversible error when it instructed the jury that Flynn had to prove by a preponderance of the evidence that she "fully disclosed all material facts to her attorney" and "actually relied on counsel's advice," but indicated that the ultimate burden of proof rested with the State to prove all elements of theft, including intent, beyond a reasonable doubt.  Because Flynn was not entitled to an instruction on the advice-of-counsel

defense in the first place, any error in the instruction itself was harmless. *See* U.C.D.R.P.–Cumberland County 52(a); M.R. Crim. P. 52(a).

D.     Bill of Particulars

[¶27]  Flynn argues that the court erred in denying her motion for a bill of particulars.  *See* U.C.D.R.P.–Cumberland County 16(c)(1); M.R. Crim. P. 16(c)(1). We review the denial of a motion for a bill of particulars for an abuse of discretion. *State v. Ardolino*, 1997 ME 141, ¶ 5, 697 A.2d 73.  "The purpose of a bill of particulars is to enable the defendant to prepare an adequate defense, to avoid prejudicial surprise at trial, and to establish a record upon which to plead double jeopardy if necessary." *Id.*

[¶28]  In order to evaluate whether a defendant was prejudiced, we "examine the record to determine what facts were known to the defendant prior to the trial." *Id.*; *see also State v. Larrabee*, 377 A.2d 463, 465 (Me. 1977); *State v. Wedge*, 322 A.2d 328, 330-32 (Me. 1974).  A court may decline to order a bill of particulars if the information requested is available through some other means. *See Larrabee*, 377 A.2d at 466.

[¶29]  Here, Flynn had ample information about the basis for the charge against her.  Her emails demonstrate her knowledge of the sources of the money that came into the Green Tree account, the obligation to return that money upon failure of the sale, and the lack of authority to convert the money to her own

personal uses. In addition, before she was indicted, Bert Martin had maintained an action against Flynn arising from the same events and deposed her twice. The materials from the civil case were part of the discovery provided to Flynn by the State. Flynn had more than enough information about the nature of the charge against her. There was no good basis to pursue a bill of particulars. The motion for a bill of particulars was properly denied.

E.    Duplicitous Indictment

[¶30]  As part of her bill of particulars argument, Flynn asserts uncertainty about the identity of the victim, claiming that the indictment was duplicitous because it "alleged three thefts from three different [victims]." As noted earlier, the single count indictment identified three victims in the disjunctive: "Flynn did commit theft pursuant to one scheme or course of conduct by obtaining or exercising unauthorized control over the property of Greentree Renewable Energy, Inc., Guangzhou Dinson Engineering & Trading Limited, or Charmwell Holdings Limited."

[¶31]  The record reflects that (1) Charmwell is the holding company for Dinson; (2) Charmwell, on Dinson's behalf, paid the $500,000 to Green Tree, to be held as an exclusivity payment to support Dinson's commitment to purchase the Domtar mill; and (3) Bert Martin, on behalf of Green Tree, ultimately repaid to Dinson the funds Flynn had misappropriated from Green Tree's account. The theft

was thus from all three named victims, with Bert Martin, on behalf of Green Tree, ultimately taking financial responsibility for the loss and becoming entitled to restitution.

[¶32]  Since 1849, our precedents have established that a defendant may be convicted, in a single count of an indictment, of a theft from multiple victims. Rejecting an argument that a theft from several victims could not be charged in a single count, we held: "[I]n indictments for larcenies, where the goods of several persons are taken at the same time, so that the transaction is the same, one count may embrace the whole.  No reason is apparent why the same rule, should not prevail for receiving stolen goods, as for larcenies." *State v. Nelson*, 29 Me. 329, 335 (1849) (citation omitted).

[¶33]  One hundred and thirty years later, speaking through Justice Harry Glassman, we comprehensively addressed this issue in *State v. Myers*, 407 A.2d 307 (Me. 1979).  In *Myers*, the towns of Mapleton, Castle Hill, and Chapman, located in Aroostook County, shared an office where the cash receipts for the three towns were comingled and placed in a single cash box.  *Id*. at 308-09. The defendant was originally charged with four separate counts of theft[7] for his theft of money and receipts from the single cash box.  *Id*.

---

[7]  The Town of Chapman was named as the victim in two counts, and Mapleton and Castle Hill were named in one count each.  *State v. Myers*, 407 A.2d 307, 308 (Me. 1979).

[¶34] The defendant moved to dismiss the indictment, alleging that the four counts were duplicitous "and the facts of the case would reveal that all counts were but one transaction; one event at one time." *Id*. at 308. The trial court denied Myers's motion. *Id.* It then granted the State's subsequent motion to combine the four counts into a single count for trial. *Id.* Following a nonjury trial on the combined count of theft, the defendant was convicted, and he appealed. *Id*.

[¶35] In affirming the conviction and the combination of the charges of theft against three victims into a single count, we recognized "a fundamental principle: 'The stealing of property from different owners at the same time and at the same place constitutes but one larceny.'" *Id.* at 309 (quoting 2 *Wharton's Criminal Law and Procedure* § 451 (Anderson ed. 1957)).

[¶36] We then observed that the original four-count indictment

actually charged but one crime. This did not render the indictment duplicitous as alleged in the defendant's motion to dismiss. "'Duplicity' is the joining in a single count of two or more distinct and separate offenses. 'Multiplicity' is the charging of a single offense in several counts." The indictment in the instant case suffered from multiplicity. The presiding Justice was correct in not granting the defendant's motion to dismiss not only because the defect did not appear on the face of the indictment but also because dismissal is not the appropriate remedy for multiplicity.[8]

*Id*. (citation omitted) (quoting 1 C. Wright, *Federal Practice and Procedure* § 142 (1969)).

---

[8] For an example of a case when we ordered convictions on multiple theft counts aggregated into a single count without referencing the term "multiplicity," see *State v. Fournier*, 617 A.2d 998, 999-1000 (Me. 1992).

[¶37]   Accordingly, we affirmed the combination of four theft counts, naming three different victims, into a single count.  *Id.* at 310.  In another context, we have approved aggregating thefts from different sources into a single count of an indictment, pursuant to 17-A M.R.S. § 352(5)(E) (2014), to enhance the value of goods stolen as part of a common scheme or plan.  *State v. Lavigne*, 588 A.2d 741, 742-43 (Me. 1991).

[¶38]   *Myers* establishes that the indictment here was not duplicitous and was properly charged, naming the three entities with an interest in the single sum of money in a single count.  Further, contrary to Flynn's contentions, it was not necessary for the court to inquire of the jury as to which named victim it found owned the funds.  Not only did Flynn fail to request such an inquiry, but even if she had, such inquiry would not appear appropriate in light of the precedent discussed above.[9]

[¶39]   The State was not required to prove a single theory of the case. *See State v. St. Pierre*, 1997 ME 107, ¶¶ 5-7, 693 A.2d 1137.  To prove that the money was the property of another pursuant to 17-A M.R.S. § 352(4), the State was only required to prove that the money was "property in which any person or government other than the actor has an interest that the actor is not privileged to

---

[9]  We do not decide whether some special circumstances in a different case might warrant inquiry into the jury's specific findings.  Here, there is no question that such inquiry was not warranted.  *Cf. State v. Stratton*, 591 A.2d 246, 246-47 (Me. 1991).

infringe, regardless of the fact that the actor also has an interest in the property," which the State proved here.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Thomas F. Hallett, Esq., Hallett, Zerillo & Whipple, P.A., Portland, for appellant Jody B. Flynn

Janet T. Mills, Attorney General, and Leanne Robbin, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Thomas F. Hallett, Esq., for appellant Jody B. Flynn

Leanne Robbin, Asst. Atty. Gen., for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2012-925
FOR CLERK REFERENCE ONLY