MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2024 ME 33
Docket:       Pen-23-252
Argued:       March 5, 2024
Decided:      May 7, 2024

Panel:        STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

RICHARD PETERS

MEAD, J.

[¶1]  Richard Peters appeals from a judgment of conviction for hunting a deer after having killed one (Class D), 12 M.R.S. § 11501(2) (2024), and unlawful possession of wild animals (Class E), 12 M.R.S. § 10658(1) (2024), entered by the trial court (Penobscot County, *Lucy, J.*) following a jury trial. Peters challenges the court's denial of his motions for a mistrial, the sufficiency of the State's bill of particulars, and the jury instructions.  He further contends that double jeopardy protections barred his conviction on the charge of unlawful possession of wild animals.  We disagree with his contentions and affirm the judgment.

[¶2]  The court initially stayed Peters's sentence to require him to report to the Androscoggin County Sheriff's alternative sentencing program.  Peters

2

contends that after he took an appeal, the court construed M.R.U. Crim. P. 38(d) too strictly when it amended the stay to require him to surrender to the Penobscot County Sheriff to serve his sentence. We agree with Peters that the court retained the authority to order the original stay and we remand for the court to consider whether to reinstate it.

## I. BACKGROUND

### A. Facts

[¶3] "Viewing the evidence in the light most favorable to the jury's verdict, the trial record supports the following facts." *State v. Healey*, 2024 ME 4, ¶ 2, 307 A.3d 1082 (quotation marks omitted).

[¶4] On November 16, 2019, during the open hunting season for deer, Game Warden William Shuman went to Peters's residence after receiving a call from a game registration station in Etna. The registration agent told Shuman that on November 13, Peters had registered a doe that he killed, and on November 15, Peters returned to the station with Ruth Smith, who was there to register a buck that she had purportedly killed and who gave the same phone number as Peters. The agent became suspicious when Peters did all of the talking concerning the buck.

[¶5] Accompanied by Game Warden Josh Beal, Shuman went to Peters's

home to investigate; eventually a third warden came with an evidence-detection dog. When he arrived, Shuman saw Peters and another man hanging a large buck from the garage. Peters acknowledged killing a doe on his property on November 13 using a .300 caliber rifle. Concerning the buck, Peters told Shuman that Smith, who held an apprentice hunting license,[1] shot it with a .30-06 rifle while they were together in the woods on the property. Asked to explain how that had happened, Peters said that he had "paunched" the deer by shooting it in the stomach, requiring him to "chase the deer around" and kill it with a neck shot. When Shuman pointed out that Peters had just acknowledged shooting the buck in the stomach and the neck using the word "I" to identify who had performed those acts, Peters became irritated and said that the warden was putting words in his mouth, and that when he used "I" he meant "we or them."

[¶6] The wardens conducted an investigation that included examining various boot tracks, drag marks, ATV tracks, deer tracks, blood, and a gut pile along a snowmobile trail on the property, and they discovered two bait sites— one an apple pile and the other a foam fake tree stump containing bait, which

---

[1] Shuman explained that an apprentice hunter requires a qualified supervisor. *See* 12 M.R.S. § 11108-B(1) (2020) (subsequently amended by P.L. 2019, ch. 639, §§ 2-5 (effective June 16, 2020) (codified at 12 M.R.S. § 11108-B(1) (2024))).

4

was located in front of a tree that had a blood spatter and what appeared to be a bullet strike.

[¶7] The wardens obtained and executed a search warrant for Peters's residence. Among the items seized were a .300 caliber rifle and a .30-06 rifle.

## B.  Procedure

[¶8] Peters was charged by criminal complaint with, in Count 1: hunting a deer after having killed one (Class D), 12 M.R.S. § 11501(2); Count 2: exceeding the bag limit on deer (Class D), 12 M.R.S. § 11501(1) (2024); Count 3: unlawful possession of wild animals (Class E), 12 M.R.S. § 10658(1); and Count 4: illegally baiting deer (Class E),[2] 12 M.R.S. § 11452(1)(B) (2020).

[¶9] The court held a jury trial on May 16 and 17, 2023, at which five wardens testified. After the State rested its case-in-chief, the court granted Peters's motion for a judgment of acquittal as to Count 4, which alleged that Peters had hunted from an observation stand or blind overlooking bait. The jury returned verdicts of guilty on Counts 1 and 3 and not guilty on Count 2.

[¶10] At the sentencing hearing, the court entered judgment and imposed the minimum mandatory penalties: three days' incarceration and a

---

[2] At the time of the alleged offense, illegally baiting deer was a Class E crime; the statute has since been amended to make this a civil offense. P.L. 2019, ch. 630, § 3 (effective June 16, 2020) (codified at 12 M.R.S. § 11452(2) (2024)).

$1,000 fine on Count 1 and a $500 fine on Count 3. 12 M.R.S. §§ 10658(2), 11501(3) (2024). By agreement, the judgment specified that the jail term was stayed so that Peters could serve the sentence through the Androscoggin County alternative sentencing program. The court did not act on the State's oral request to forfeit the .30-06 rifle, determining that the State had cited no persuasive statutory basis for it to do so.[3]

[¶11] Peters timely appealed and moved for a stay of execution pending appeal. M.R. App. P. 2B(b)(1). The court granted the motion but stated that Peters "shall be aware that [M.R.U. Crim. P.] Rule 38(d) applies as to his jail sentence if his appeal is unsuccessful. That rule does not allow for accommodating alternative sentencing program delays." In accordance with its interpretation of Rule 38(d), the court amended the judgment by striking the original stay permitting the alternative sentencing program in Androscoggin County and substituting an ordinary stay pending appeal, following which Peters would be required to surrender to the Penobscot County Sheriff to serve his three-day sentence.

---

[3] On appeal, Peters asks us to order that the firearms seized by wardens be returned to him. We conclude that this issue is not ripe for our decision given that there has been no libel proceeding against the firearms in the trial court pursuant to 12 M.R.S. §§ 10502-10503 (2024), nor has Peters moved for return of the property pursuant to M.R.U. Crim. P. 41(j). Accordingly, we do not discuss the issue further. *See State v. Carrillo*, 2018 ME 84, ¶ 4, 187 A.3d 621.

## II.  DISCUSSION

### A.     Motions for Mistrial

[¶12]  In June 2022, almost a year before trial, Peters moved for an order requiring the State to produce a report concerning any expert that it intended to call; the court granted the motion.  The State did not produce any such report. The day before trial, Peters moved in limine for a pretrial ruling on the admissibility of evidence concerning "[a]ny testimony regarding a matching of footwear seized from the defendant's residence to footprints observed in the snow on the defendant's property."  In an off-the-record chambers conference on the morning of trial, the court reserved ruling on the motion.

[¶13]  At sidebar before Warden Shuman testified, Peters renewed his objection to "anything with respect to either footprints in the snow or boots found at the residence, or any comparison [between them]," arguing that "it's subject to expert testimony, so the State should be prohibited from offering any testimony comparing them . . . [and] if the court sustains that . . . then what's the relevance."  The court elected to "cross that when we get . . . there" and proceeded to hear evidence.

[¶14]  As the trial progressed, the State elicited evidence of boot tracks in the snow to establish the movement of people around the property relative to

the deer, but the court did not allow the State to elicit evidence of the size of the boot tracks to show they matched Peters's feet rather than Smith's, ruling that correlating boot size with foot size required "some level of expertise." *See State v. Dolloff*, 2012 ME 130, ¶ 30, 58 A.3d 1032 (concluding that the trial court did not abuse its discretion in permitting an expert witness to give an opinion regarding "how . . . bloody footprints . . . were likely made"). Peters essentially agreed: "I appreciate the court's ruling and frankly, wouldn't object—I don't think my objection goes so far as to prohibit the State from talking about footprints."

[¶15] The court consistently prevented the State from presenting evidence that it had ruled would require expert testimony. When the State asked Shuman, "[D]id you observe some boots inside the residence?" Peters objected and moved for a mistrial, arguing that the jury would wonder "why [the prosecutor] would be looking to admit those boots if they didn't match the footprints that were in the snow?" The court declined to order a mistrial but again barred the State from introducing evidence as to the size of the boots and the relative sizes of Peters's and Smith's feet for the purpose of establishing "that the boots in the house could have made the tracks in the snow."

[¶16] When the State later continued to argue that the size of the boots

8

found in the house was relevant, the court disagreed, ruling that absent expert testimony, comparisons between particular boots and the boot tracks found in the snow invited the jury to speculate. Ultimately, when the State asked the court, "So if I ask [Shuman] if . . . one had larger feet than the other, you'd say that's excluded?" the court answered, "Yes." The court's ruling did not change when the State argued that Peters had opened the door to evidence of foot size when cross-examining Shuman.

[¶17] On the second day of the trial, during the State's direct examination of Warden Beal, the prosecutor asked Beal to "describe for the jury the circumstances of [his] conversation" with Smith. Beal answered, in part, "I noticed, you know, she's a relatively small woman. She had relatively small feet." In response to Peters's motion for a mistrial on the ground that the State had been instructed to "steer clear of this," the prosecutor said that he did not expect the answer that Beal gave. The court again denied a mistrial but gave a curative instruction at Peters's request. *See State v. Carrillo*, 2021 ME 18, ¶ 25, 248 A.3d 193 ("Jurors are presumed to follow instructions, including curative instructions to ignore references to inadmissible evidence.").

[¶18] During closing arguments, the State asserted that the evidence supported a finding that "[a] person with a boot track came down here [where

Peters said he had been]." Peters, in contrast, referenced what he had

previously argued the State could not:

> Now, what about boot prints? We've got boot prints. . . . [T]he State, they've given you pictures . . . of boot prints in the snow. They say that there are three sets in the snow. . . . And you got pictures of one being bigger than the other.

> So what? So what does that mean? Is this any evidence tying these to . . . either Dick Peters or to Ruth [Smith]? . . .

> Who has bigger feet? Are we presuming that . . . a woman has smaller feet? Is that what the State wants you to presume? It's certainly not a part of this case. Do these tracks match any footwear belonging to my client or to Ruth? No evidence. So all these pictures of footprints in the snow, they really mean absolutely nothing on the issue of leading you to determine who shot the deer.

[¶19] Peters now asserts that the court erred in denying his motions for

a mistrial concerning the boot track evidence. In *State v. Hunt*, we said that

> [w]e review the denial of a motion for a mistrial for an abuse of discretion and will overrule the denial of a mistrial only in the event of exceptionally prejudicial circumstances or prosecutorial bad faith. A motion for a mistrial should be denied except in the rare circumstance that the trial is unable to continue with a fair result and only a new trial will satisfy the interests of justice. *State v. Williams*, 2020 ME 128, ¶ 34, 241 A.3d 835 (citation and quotation marks omitted); *see Carrillo*, 2021 ME 18, ¶ 19, 248 A.3d 193 ("Our review of a trial court's denial of a motion for a mistrial is highly deferential. We review the court's denial of a motion for mistrial only for an abuse of the court's substantial discretion." (citations omitted)).

2023 ME 26, ¶ 45, 293 A.3d 423 (alteration omitted).

[¶20] Applying that "highly deferential" standard of review here, *id.*, we conclude that the court did not abuse its substantial discretion when it denied the motion for a mistrial given that it had consistently excluded evidence requiring expert testimony and gave a curative instruction when requested and appropriate.

## B. Bill of Particulars

[¶21] Count 3 of the complaint charged that Peters, "[o]n or about November 16, 2019, . . . did possess a wild animal . . . that he [did] not possess by any lawful means." Following a chambers conference on the morning of trial, the court had the impression that the State intended to dismiss Count 3, but the prosecutor advised that "after reflection and after talking to the warden, we intend to maintain Count [3]."

[¶22] Peters, citing "a little bit of a . . . left turn here at the . . . last minute," orally moved for a bill of particulars because the State's original theory underlying Count 3 was that deer meat seized from Peters's freezer and sent for DNA analysis would match one of the two deer taken on his property, but "[i]t didn't match." For that reason, Peters expected a dismissal of Count 3. The State did not object to Peters's request for particulars and responded:

> [W]e're going [with] November 13th . . . we have evidence to suggest that on November 13th, the defendant took a deer by using bait. And by doing so, he took that deer in an unlawful manner and therefore possessed an animal that was not taken lawfully.

Asked if the State's proffer was sufficient, Peters answered, "Well, yes, Your Honor, although . . . I would object to the State's late pivot in terms of their theory underlying Count [3]."

[¶23] In discussing potential jury instructions at the conclusion of the first day of the trial, there was a disagreement over the factual basis for Count 3. Peters objected to "any effort to expand upon [the] bill of particulars," stating his understanding that the same act alleged in Count 4—hunting from a stand or blind overlooking bait in violation of 12 M.R.S. § 11452(1)(B)[4]—was the "unlawful means" now alleged in Count 3. The prosecutor clarified that in Count 3 the State intended to prove a violation of the section 11452(1)(A) alternative, i.e., "by placing the bait, that . . . constitutes the unlawful means."

---

[4] The statute provides, in part:

**1. Prohibitions.** A person may not, during an open hunting season on deer:

**A.** Place salt or any other bait or food in a place to entice deer to that place; or

**B.** Hunt from an observation stand or blind overlooking salt, grain, fruit, nuts or other foods known to be attractive to deer. . . .

12 M.R.S. § 11452(1) (2020).

12

Defense counsel said that "[i]f I had known it was just the placing of the bait, I would have cross-examined witnesses as to that."

[¶24]  After the State rested, Peters renewed his objection to an instruction consistent with section 11452(1)(A), asking instead for an instruction consistent with section 11452(1)(B).  When the court pointed out that it had just granted Peters's motion for a judgment of acquittal on Count 4 based on that same language, Peters, admitting to using "kind of . . . a . . . circular movement here," said that if the court agreed that he was prejudiced by the inclusion of section 11452(1)(A) language and instead substituted section 11452(1)(B) language—the same language used in Count 4—he would then move for a judgment of acquittal on Count 3 for the same reason he had successfully obtained an acquittal on Count 4.

[¶25]  The court disagreed with Peters's recollection of the bill of particulars and declined his request, later instructing the jury concerning Count 3 that "[a]s it relates to this charge, a person may not, during an open hunting season on deer, place salt or any other bait or food in a place to entice deer to that place."  Peters renewed his objection to the instruction as given.

[¶26]  We review a trial court's action on a motion for a bill of particulars for an abuse of discretion.  *State v. Flynn*, 2015 ME 149, ¶ 27, 127 A.3d 1239.

We have said that

> [t]he purpose of a bill of particulars is to enable the defendant to prepare an adequate defense, to avoid prejudicial surprise at trial, and to establish a record upon which to plead double jeopardy if necessary.
>
> In order to evaluate whether a defendant was prejudiced, we examine the record to determine what facts were known to the defendant prior to the trial.

*Id.* ¶¶ 27-28 (citation and quotation marks omitted); *see* M.R.U. Crim. P. 16(d)(1).

[¶27]  Here, as the State noted, the evidence concerning Peters's alleged baiting of deer was not a surprise and "he had plenty of time to cross-examine witnesses about bait."  The instruction the court gave concerning Count 3 was consistent with the bill of particulars offered by the State before any evidence was received.  Accordingly, the record reveals no error.[5]

## C.    Double Jeopardy

[¶28]  Peters contends that his acquittal on Count 4, which was based on the prohibited act set out in 12 M.R.S. § 11452(1)(B), *see supra* n.4, "applies to *all sections and or subsections* which provide how [a] violation of Section 11452

---

[5] A single sentence in Peters's brief cites the Maine Constitution as support for his argument that "the alleged crime of possession by other than lawful means shifts the burden of proof to the Accused" and "allows less than a unanimous verdict."  That argument is undeveloped and thus waived*.  See Capelety v. Estes*, 2023 ME 50, ¶ 16 n.4, 300 A.3d 817.

could be committed," including the section 11452(1)(A) alternative forming the basis of Count 3. For that reason, Peters argues, his conviction on Count 3 is barred by his constitutional protections against double jeopardy. "We review double jeopardy claims de novo." *State v. Hodgdon*, 2017 ME 122, ¶ 18, 164 A.3d 959.

[¶29] Peters's argument fails. The double jeopardy protections of the federal and Maine Constitutions "prevent a *second* prosecution for the same offense after an acquittal." *State v. Weckerly*, 2018 ME 40, ¶ 7, 181 A.3d 675 (emphasis added). Counts 3 and 4 were brought in the same prosecution and were tried together.

[¶30] Double jeopardy protections also bar "the imposition of multiple punishments for the same offense." *Id.* We have said that

> because a person, by one act or transaction, may violate multiple criminal laws, courts apply the *Blockburger* test to determine whether the crimes enumerated by those multiple statutes are the same offense for purposes of double jeopardy protections. The test asks whether each statutory provision requires proof of a fact that the other does not. If each statutory provision requires a unique proof of fact, the *Blockburger* test is satisfied and there is no double jeopardy violation by subsequent prosecutions or multiple punishments.

*State v. Chase*, 2023 ME 32, ¶ 22, 294 A.3d 154 (alteration and quotation marks omitted); *see Blockburger v. United States*, 284 U.S. 299, 304 (1932). Here,

section 11452(1)(A) contains the unique element that a person "[p]lace . . . bait . . . to entice deer"; and section 11452(1)(B) has the unique element that a person "[h]unt from an observation stand or blind," which may overlook, inter alia, bait placed by others.

## D. Jury Instructions

[¶31] Warden Shuman testified that Ruth Smith held an apprentice hunting license. He agreed that an apprentice hunter required a supervisor and that the supervisor would not be hunting "as long as they didn't have a firearm per se or something along those lines."[6]

[¶32] Concerning Count 1, Peters requested a jury instruction stating that "[a] person does not hunt by accompanying an apprentice hunter on a hunt," or by "assisting in transporting a lawfully killed deer." When asked by the court if he had any authority for those requests, Peters said, "No, except for the authority that it would lead to an absurd result . . . ." The court declined to give the requested instruction, concluding that Peters was asking it "to narrow

---

[6] The statute then in effect provided that "[a] holder of an apprentice hunter license may not hunt other than in the presence of a youth hunter supervisor" and further provided that "[a] resident or nonresident 16 years of age or older who has never held a valid adult hunting license in this State, or any other state, province or country, is eligible to obtain an apprentice hunter license." 12 M.R.S. § 11108-B(1), (3) (2020). The statute has since been amended. P.L. 2019, ch. 639, §§ 2-5 (effective June 16, 2020) (codified at 12 M.R.S. § 11108-B (2024)).

the statutory definition of hunt" as set out in 12 M.R.S. § 10001(31) (2024).[7]

The court noted that Peters was free to "make [his] arguments that nobody is claiming that there was anything improper about a scenario where the defendant was accompanying another hunter, apprentice or otherwise, without carrying a gun and hunting himself."

[¶33] The court ultimately gave the jury the statutory definition of "hunt" after Peters asked the jury in closing to "remember, Warden . . . Shuman told you that it's not illegal for a person to accompany an apprentice hunter on a hunt. That's not illegal."

[¶34] Peters asserts that the court erred in declining to give the instruction he proposed. We have set out the standard of review and Peters's burden:

> In general, we review jury instructions in their entirety to determine whether they presented the relevant issues to the jury fairly, accurately, and adequately, and we will vacate the court's judgment only if the erroneous instruction resulted in prejudice. Prejudice occurs when an erroneous instruction on a particular point of law affects the jury's verdict, or alternatively, when the instruction was so plainly wrong and the point involved so vital that the verdict must have been based upon a misconception of the law. The appellant has the burden of demonstrating that an erroneous instruction affected the jury's verdict.

---

[7] The statute provides: "To 'hunt' means to pursue, catch, take, kill or harvest wild animals or wild birds or to attempt to catch, take, kill or harvest wild animals or wild birds." 12 M.R.S. § 10001(31) (2024).

*State v. Hansley*, 2019 ME 35, ¶ 8, 203 A.3d 827 (citations and quotation marks omitted).  Further,

> where the appellant has preserved the issue for appeal by requesting that the court give the instruction at issue, we will vacate the judgment if the appellant demonstrates that the requested jury instruction (1) stated the law correctly; (2) was generated by the evidence; (3) was not misleading or confusing; and (4) was not sufficiently covered in the instructions the court gave.  In addition, the court's refusal to give the requested instruction must have been prejudicial to the requesting party.

*State v. Russell*, 2023 ME 64, ¶ 18, 303 A.3d 640 (alterations and quotation marks omitted).

[¶35]  Here, the court's instruction, quoting the statutory definition of "hunt," stated the applicable law correctly.  Peters fails to demonstrate prejudice because he was able to argue that if the jury found that he was merely accompanying Smith on her hunt, then he was not hunting himself.  Finally, the statutory definition "sufficiently covered" the substance of Peters's requested instruction, *id.*, because the jury would understand from it that passive supervision was not what the law prohibited—only if the jury found that Peters engaged in an active role by "pursu[ing], catch[ing], tak[ing], kill[ing] or harvest[ing] wild animals" could it find him guilty.  12 M.R.S. § 10001(31).

18

## E.    Stay of Execution

[¶36]  Peters finally asserts that the trial court erred in amending the judgment and commitment by striking its original stay of execution, which would have allowed him to report to the Androscoggin County Sheriff's alternative sentencing program following this appeal, and substituting a stay directing Peters to report to the Penobscot County Sheriff to serve his sentence post-appeal.  The court did so after determining that M.R.U. Crim. P. 38(d) "applies . . . [and] does not allow for accommodating alternative sentencing program delays."[8]  The State takes no position on this issue.  We review the court's construction of the Rule de novo.  *See Green Tree Fin. Corp. v. Patten*, 2000 ME 42, ¶ 13, 746 A.2d 373.

---

[8]  Maine Rule of Unified Criminal Procedure 38(d) provides:

**(d) Surrender of Defendant Following Automatic Termination of Stay.**  When a stay of a sentence of imprisonment automatically terminates pursuant to subdivision (c), the clerk of the Unified Criminal Docket shall forthwith mail a date-stamped copy of the mandate to the parties and to the sheriff named in the commitment order. Within 3 days after that mailing, excluding Saturdays, Sundays, and legal holidays, the defendant's appellate counsel or, if not represented by counsel on appeal, the defendant shall contact the office of the sheriff named in the commitment order and make arrangements satisfactory to the sheriff for surrendering into that sheriff's custody that day or, at the direction of the sheriff, the next regular business day.  If such arrangements are not timely made, or if the arrangements are not complied with, upon the request of the named sheriff or the attorney for the State, or by direction of the court, the clerk shall issue a warrant for the defendant's arrest.  Upon issuance of that warrant and necessary notice by the clerk to the court of that fact, the court, in conformity with Rule 46(g)(1), shall declare a forfeiture of the post-conviction bail because of the breach of condition.

[¶37]  The court was correct in that the Rule makes no explicit provision for a stay in order to accommodate an alternative sentencing program to be held on an unspecified date in another county.[9]  That said, we conclude that the court, having determined that the alternative sentencing program was appropriate, retained the discretion to order a stay to effectuate that determination.  The intent of the Rule is to establish a procedure and timeline by which a defendant will surrender to "the sheriff named in the commitment order and make arrangements satisfactory to the sheriff for surrendering into that sheriff's custody" following an unsuccessful appeal.  M.R.U. Crim. P. 38(d).  Here, following the issuance of our mandate, the trial court has the authority to do what it originally did—coordinate with Androscoggin County for an alternative sentencing program date and stay the execution of Peters's sentence accordingly.

[¶38]  Having clarified the court's authority under the Rule, we remand for the court to consider whether to reinstate the condition of the original stay requiring Peters to serve his sentence through an alternative sentencing program.

---

[9]  The court originally stayed Peters's sentence to a specific date, presumably the date of the next alternative sentencing program in Androscoggin County.

The entry is:

> Judgment affirmed. Remanded for the court to consider the terms of the stay of execution consistent with this opinion.

---

Andrews Bruce Campbell, Esq. (orally), Andrews Bruce Campbell, P.A., Bowdoinham, for appellant Richard Peters

R. Christopher Almy, District Attorney, and Mark A. Rucci, Dep. Dist. Atty. (orally), Prosecutorial District V, Bangor, for appellee State of Maine

Penobscot Unified Criminal Docket docket number CR-2020-20427
FOR CLERK REFERENCE ONLY